STATE OF NORTH CAROLINA v. ERIC GLENN LANE

No. 606A05

(Filed 11 March 2011)

**1. Constitutional Law— criminal law—first-degree murder— competency to stand trial—knowing and voluntary waiver of counsel**

The trial court properly allowed defendant's motion to proceed *pro se* in a prosecution for first-degree murder in which the death penalty was sought where defendant was found competent to stand trial under the standard in *Dusky v. United States*, 362 U.S. 389 (1993), and was never denied his constitutional right to self-representation (because he was allowed to proceed *pro se*). Before allowing defendant to represent himself, the trial court conducted a thorough inquiry and determined that defendant's waiver of his constitutional right to counsel was knowing and voluntary. Defendant's calculation that death was preferable to life in prison was reached for his own reasons and through his own rational thought process.

**2. Evidence— relevancy—expert testimony—alcohol withdrawal**

The trial court properly excluded expert testimony from a first-degree murder prosecution as irrelevant where the expert would have testified about defendant's pattern of alcohol use and the potential consequences of alcohol withdrawal. The expert could offer no opinion about the severity of any symptoms defendant may have been experiencing at the time of his confession, nor did the expert indicate that symptoms that did occur would have made defendant more susceptible to suggestion or caused him to confess falsely. There was earlier evidence about defendant's condition when he confessed and testimony about his alcoholism, and the jury could already assess how withdrawal from alcohol affected the reliability of defendant's confession.

**3. Discovery— violation—sanctions—exclusion of expert testimony**

The trial court did not abuse its discretion in a first-degree murder prosecution by excluding an expert's testimony as a discovery sanction where there was an issue about the State's receipt of final reports from a potential expert witness for the defense. It could not be determined from the record whether the trial court's ruling that the proposed testimony was outside

STATE v. LANE

[365 N.C. 7 (2011)]

the scope of the preliminary report that had been provided was correct, but the witness testified during *voir dire* that defense counsel had never requested a subsequent report, the trial court had already pursued other measures contemplated by N.C.G.S. § 15A-910, and the trial court struck the appropriate balance as to materiality.

**4. Sentencing— capital—no significant history of prior criminal activity—not submitted**

The trial court did not err in a first-degree murder sentencing proceeding by not submitting the statutory mitigating circumstance that defendant had no significant history of prior criminal activity where defendant instructed his counsel not to take any position or make any requests. The forecast of evidence sufficiently supported the trial court's threshold determination that no rational jury would have found that defendant's prior criminal activity was insignificant, and the trial court properly balanced the potentially severe prejudicial effect of the testimony of defendant's former wife against defendant's failure to request the instruction and any possible mitigating value.

**5. Sentencing— capital—death—not disproportionate**

A sentence of death for a first-degree murder was proportionate where defendant confessed to taking advantage of a trusting five-year-old child, raping and sodomizing her before putting her, while still alive, in a garbage bag sealed with duct tape, wrapping her in a tarp, discarding her body in a creek, and not seeking medical assistance or otherwise helping the victim before she succumbed to what he claimed was an accidental death. The sentence was not imposed under arbitrary influence and was more analogous to cases in which the death sentence was found proportionate than to those where it was found disproportionate.

Justice JACKSON took no part in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Gary E. Trawick on 11 July 2005 in Superior Court, Wayne County, upon a jury verdict finding defendant guilty of first-degree murder. On 20 March 2008, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. After hearing oral argument on 17 November 2008, the Supreme Court issued an opin-

STATE v. LANE

[365 N.C. 7 (2011)]

ion on 12 December 2008, *State v. Lane*, 362 N.C. 667, 669 S.E.2d 321 (2008) (per curiam), as clarified by an order entered on 9 March 2009, remanding the case to the trial court for further hearings, findings of fact, and conclusions of law. Following entry of an order on remand by Judge D. Jack Hooks, Jr. on 22 June 2009 in Superior Court, Wayne County, the Court entered an order on 8 October 2009 allowing defendant's motion for supplemental briefing following the remand. Heard in the Supreme Court on the issues addressed in the supplemental briefs on 10 May 2010.

> *Roy Cooper, Attorney General, by Derrick C. Mertz, Assistant Attorney General, and Robert C. Montgomery, Special Deputy Attorney General, for the State.*

> *Ann B. Petersen and James R. Glover for defendant-appellant.*

HUDSON, Justice.

Defendant Eric Glenn Lane appeals his conviction and sentence to death for the first-degree murder of five-year-old Precious Ebony Whitfield. Defendant was found guilty of first-degree murder based on jury findings of malice, premeditation, and deliberation and under the felony murder rule. Defendant was also convicted of related charges of first-degree statutory rape, first-degree statutory sex offense, indecent liberties, and first-degree kidnapping. We find no error in defendant's trial or sentencing, and we further determine that defendant's sentence of death is not disproportionate to his crimes.

## PROCEDURAL AND FACTUAL BACKGROUND

At about 4:45 p.m. on 17 May 2002, Michelle Whitfield dropped off her five-year-old daughter Precious and her two younger children at the Goldsboro home of Gladys Johnson, who was Precious's step-grandmother. Because Michelle worked evenings, Mrs. Johnson and two of her sons often watched the children for her. That night, Mrs. Johnson planned to be home by 5:30, but stopped off on her way home to pick up some things for dinner. In the meantime, her younger son Travion had Precious do her homework before allowing Precious to play at a neighbor's house.

Precious and her friend Michael rode up and down his driveway on their bikes, with Precious on a borrowed red-and-white bicycle. The two saw defendant in his nearby yard and went over to see if they could play on his swing set. After swinging for awhile, with defendant helping to push Precious, the children went inside de-

fendant's house for a few minutes to see the goldfish and eels defendant kept in a tank. Defendant gave Precious a soda, and she and Michael played on the swing set for several minutes longer before getting back on their bikes and returning to Michael's house.

Around 6:30 p.m., Michael's mother told Precious that it was time to go home, as Michael and his family were leaving for the evening. Precious left on the red-and-white bicycle, and Michael's mother assumed she had gone back to Mrs. Johnson's house. However, when Mrs. Johnson sent Travion to get Precious for dinner at about 7:00 p.m., he was unable to find her at Michael's house or elsewhere in the neighborhood. After repeated searches on their own, and under the mistaken belief that they could not file an official report until Precious had been missing for twenty-four hours, Precious's family called law enforcement the following morning, Saturday, 18 May 2002.

Deputies commenced a general search for Precious and questioned several people, including defendant, as part of a neighborhood canvass. Defendant told a detective that Precious and Michael had been at his house for about ten minutes late Friday afternoon, playing on his swing set and seeing his goldfish and eels. A brief search of defendant's house, with his consent, yielded no sign of Precious. Detectives returned twice more to defendant's house on Saturday, once checking a shed on his property. His story was consistent about his interactions with Precious and Michael on Friday, and law enforcement continued pursuing other leads.

Despite extensive efforts and manpower, law enforcement agencies were unable to find Precious. During the early afternoon of Sunday, 19 May 2002, local residents fishing in a nearby creek discovered Precious, with her upper body wrapped in a trash bag, her legs pulled up to her chest with duct tape, and duct tape also wrapped around her head such that her face and hair were not visible. The crotch of her shorts and panties had been jaggedly cut, and that area was bloody and red. Deputies responded within roughly thirty minutes of the residents' 911 call reporting the body, which was not touched in that interval. An autopsy later showed that Precious had suffered some blunt force trauma and also had several bruises and lacerations, and there was evidence of sexual assault. The official cause of death was "asphyxia secondary to suffocation"; the medical examiner concluded that Precious had been alive when she was put into the trash bag and died in part because she had vomited while struggling against the tape, then breathed some of the

vomit back into her lungs. A red-and-white bicycle, later identified as the one Precious had been riding, was also recovered in the creek, and a blue tarp rolled up with duct tape at one end was found in a nearby ditch.

While law enforcement investigated the scene at the creek, Sammy Sasser passed by and learned that the body of a missing girl had been discovered there. He then went to the Sheriff's Department to tell them what he had seen while driving in that area on Friday evening. Mr. Sasser reported that he observed a man with a red scooter with a basket, on the left side of the bridge, along with a "raincoat or something wrapped up in a clump" with duct tape lying about eight to ten feet behind the scooter. He described the man as a small- to medium-framed person wearing a blue jacket and lighter shade helmet. Several other witnesses later corroborated Mr. Sasser's account, variously testifying at trial that they had seen a white male on a red scooter or red moped with a black basket in the area of the bridge going over the creek between 7:15 and 7:45 on Friday night. The witnesses reported seeing the man struggling with a large bundle wrapped in a blue tarp and with a small red-and-white bicycle.

. Based on this information and their knowledge that defendant had a red scooter, Detectives Mike Kabler and Shawn Harris returned to defendant's house. Defendant agreed to be interviewed at the Sheriff's Department, where he essentially repeated the story he had told earlier: that Precious and Michael had been at his house for a brief period in the late afternoon or evening on Friday and then left. He said he did not see Precious again that night.

Defendant again consented to a search of his residence and storage sheds and went with detectives at approximately 10:45 p.m. on Sunday night to conduct the search, which took roughly two and a half hours. In defendant's storage sheds, deputies found a red scooter with a black basket and a white helmet, as well as rolls of duct tape and electrical tape, both of which held blue fibers consistent with the tarp found where Precious's body was discovered. Deputies also seized trash bags similar to the one wrapped around Precious's upper body, and a blue coat with a red spot on it. Defendant gave another, formal statement to detectives, confirming his earlier story that he had not seen Precious or Michael after they left his house early Friday evening.

That Tuesday morning, 21 May 2002, Detectives Kabler and Tony Morris picked defendant up at his home for a prearranged appoint-

ment to give a statement to a State Bureau of Investigation (SBI) agent at the agency's Greenville office. Special Agent Joseph Smith met with defendant and detected "no impairments," although defendant had told Detectives Kabler and Morris that morning that he was an alcoholic, occasionally suffered from seizures, and was hung over and feeling sick from drinking the previous night. In the course of the interview, defendant initially implicated himself in Precious's death by stating that he had "wrapped the young'n in duct tape." He ultimately gave the following full confession, first orally and then reduced to writing, corrected, and signed:

> I, Eric Lane, came home from work on Friday, May 17, 2002, at about 3:00 p.m. or 3:30 p.m. I . . . started drinking beer. Michael . . . and Precious . . . came over to my house at about ten or 15 minutes after I got home. I had drank about three beers before they got there. They [] were riding bicycles. I was lying in the backyard in front of the swing. They asked if they could swing. I said yes. They asked me to push them on the swing so I did. . . . Precious asked for something to drink. I went in the house and got some—got them some Pepsi. They came to the door and Precious stepped in the house. . . . I told them to go look at the eels which were in the living room. They then went to [defendant's son's] room to look at the goldfish. They stayed in the house about ten minutes. They then went back outside and played on the swing again. I went back out with them.
>
> . . .
>
> After about five minutes . . . [they] left. . . .
>
> . . . I was still drinking. About 15 minutes later, Precious came back to the house riding a white and red bicycle. She asked if she could look at the eels again so we went in the house. At first I sat at the kitchen table while Precious played with [defendant's son's] toys in his room. She played in his room for ten or 15 minutes. I was still drinking beer.
>
> I got up and started feeding the eels and she came into the living room with me. She was wearing jean shorts/skirt. I don't remember what color her shirt was. She was wearing white tennis shoes. I think I was wearing tan shorts. I wasn't wearing a shirt. I was wearing my white cap with "USA" and American flag on it.
>
> I started playing with her, tickling her. She fell on the floor laughing. We were both [on] the floor playing. The next thing I

remember I woke up on top of her. I pushed myself up with my hand which was on her shoulder. She was unconscious. My shorts were down as well as my underwear. I pulled up her shorts and maybe her panties. They were not all the way down. I shook her trying to get her to wake up. I had my hands on her shoulders while shaking her.

I started to walk around the house and tried to figure out what happened. . . . I then walked outside where I saw her bicycle. I put it in the white building. I walked around the building for ten or 15 minutes trying to figure out what to do. I knew I had to get her out so I grabbed a blue tarp in the white building and got a roll of duct tape out of the other building. I grabbed the trash bag out of the trash can because it was the only one I had. It was white with red handles. I wrapped her in the trash bag and then taped the bag around her. I put the tarp around her and wrapped her in the tarp. I taped the tarp around her. I drank for a minute. I got her and a couple of beers and went to the white building. I put her in the middle of my scooter where you put your feet. My scooter is red. . . . I hung the bicycle on the scooter basket. I then left on the scooter.

I went to the creek. [Defendant described the route he took]. . . . I got to [the] creek, parked the scooter and got Precious and the bicycle off the scooter. The tarp came off of her when I was getting her off. I don't know what time it was but it was getting dark.

A car came so I ran and threw the bicycle in the creek and [hid] under the bridge. I sat there and drank the two beers I had and threw the bottles in the creek. I laid the body at the edge of the water under the bridge where someone could find it.

I grabbed the tarp and went to the scooter. I took the same path back home. The tarp blew off on the way back. I didn't stop to get it. I just went home.

. . . I guess I raped her, too, but I don't remember.

I was wearing a white helmet when I took Precious to the creek.

When I pulled out of my driveway, the body almost fell off the scooter. I stopped and pulled her back onto the scooter. . . . I was wearing a red pullover shirt and a blue jacket and tan shorts. The

deputies have all the clothing that I was wearing except for the red shirt, which is still at the house. There was no blood on the floor of my house. I remember seeing a black SUV at the end of my driveway when I stopped to pull the tarp back on the scooter.

I remember that when Precious and I were in the living room, I started tickling her and we both were on the floor. I tickled her between her legs and her private parts area. Her pants came down. Somehow my pant[s] came down also. I don't remember actually having sex with her but I'm pretty sure I did. I don't remember looking for signs that we had sex. I thought she was dead when I put the trash bag over her. She never moved so I thought I had suffocated her with my body or her neck twisted and she died.

Agent Smith later recounted that as part of his interviewing technique, he suggested to defendant that he may not have remembered raping Precious because he had blacked out; according to Agent Smith, defendant subsequently adopted this explanation in his confessions. Defendant never claimed that his inability to remember was related to his alcohol consumption, but he did express shame and remorse with statements such as "I'm sick. I'm a sick person. I wish I was dead," and "I'm a rapist and a killer. I wish I was dead. . . ."

Detectives Kabler and Morris drove defendant back to the Wayne County Sheriff's Department, where they re-interviewed him and he gave a statement with the same timeline and details of what he had told Agent Smith. Defendant also maintained that he "d[id] not remember but if the girl was sexually molested then I must have did [sic] it," and he recounted how he had wrapped Precious's body in a tarp and disposed of her at the creek. After being arrested and booked, defendant suffered an apparent seizure, but he did not require medical attention and went unassisted to his cell. Based on the new information provided by defendant, deputies conducted another search of his home, where they recovered the shirt and shoes defendant said he had been wearing the day Precious died. Deputies also obtained a piece of defendant's living room carpet.

Subsequent forensic analysis of the items taken during the searches of defendant's home did not yield any definitive matches. However, the trash bag in which Precious was found was determined to be consistent with others taken from defendant's home. Likewise, blue fibers found on defendant's gloves and clothes, his scooter, the roll of duct tape taken from his home, Precious's body and clothing,

the trash bag and duct tape around her body, and defendant's carpet and bed cover—twenty-two items in all—were determined to be consistent with the blue tarp fabric. A hair collected from the living room carpet sample was "microscopically consistent" with Precious's hair, as were hairs taken from defendant's vacuum cleaner. Defendant, or his maternal relatives, "could not be ruled out" as the source of the mitochondrial DNA of a hair found in Precious's anus. An SBI analyst also physically matched the torn ends of the duct tape from the blue tarp and the trash bag to the roll belonging to defendant.

On 7 April 2003, defendant was indicted in Wayne County for first-degree murder, first-degree statutory rape, first-degree statutory sex offense, indecent liberties, lewd and lascivious conduct, and first-degree kidnapping. The murder indictment listed three aggravating circumstances that would support imposition of the death penalty: (1) "The defendant had been previously convicted of a felony involving the use or threat of violence to the person," N.C.G.S. § 15A-2000(e)(3) (2009); (2) "The capital felony was committed while the defendant was engaged . . . in the commission of, or an attempt to commit, or flight after committing or attempting to commit" the offenses of "rape[,] sex offense [and] kidnapping," id. § 15A-2000(e)(5) (2009); and (3) "The capital felony was especially heinous, atrocious, or cruel, id." § 15A-2000(e)(9) (2009).

In response to a defense motion requesting an evaluation of defendant's competence to stand trial, defendant was committed to Dorothea Dix Hospital on 5 March 2004, where he remained for three months. At a motions hearing in April, the trial date was set for October 2004. Just before the beginning of defendant's capital trial, defense counsel gave notice to the trial judge that they intended to raise a claim that defendant was mentally retarded. Around the same time defendant sent a letter to the trial judge expressing his unhappiness with his attorneys and stating his desire to proceed pro se. The judge questioned defendant at length concerning his request and committed him again to Dix for further evaluation of his capacity to represent himself. Defendant withdrew the request a week later. Following a hearing, the trial judge entered an order on 13 October 2004, finding defendant competent to stand trial.

Jury selection then began, resulting in twelve jurors being seated by 4 November 2004. However, following allegations of juror misconduct—and over defendant's objections and insistence that the trial not be delayed—the trial court discharged the seated jurors and continued the case to a later trial date. At that point,

defendant again informed the trial judge that he wanted to represent himself from then on. Defendant was sent to Dix for further evaluation of his capacity to proceed *pro se*, and the trial judge heard defendant's request on 23 November 2004. Expert witnesses testified about defendant's mental disorders and illiteracy, and defendant answered questions about his understanding of the charges against him, the potential penalties for being found guilty, and the conduct of the proceedings.

At the conclusion of the hearing, the trial judge entered an order allowing defendant to discharge his court-appointed counsel and proceed *pro se*. The trial court found as fact that defendant's "literacy level at best would be found to be at the third grade level," but is "probably or more likely in the range of kindergarten through the second grade," and that defendant "has been found to suffer from anxiety disorders, probably Post Traumatic Stress Disorder, and to have other mental symptoms" that were "carefully considered" by the trial court. In addition, after noting that defendant had previously been found to be competent to stand trial, the judge found that the trial court "had explained to [defendant] in detail" his constitutional right to counsel, "the benefits of having assigned counsel, as well as the disadvantages or potential disadvantages of representing himself," and that he "would be held to the very same standards in the trial of these matters as would an attorney."

The trial court both found as fact and concluded as a matter of law that defendant was "clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel, that he understands and appreciates the consequences of his decision and comprehends the nature of the charges and proceedings and the range of permissible punishments." In addition, the trial court concluded:

> 3. That . . . while the defendant is largely illiterate, the court has carefully considered the same and the court has pointed out to [defendant] the disadvantages he faces as a result of his limited reading and writing ability. That [defendant] is well aware of these. The court specifically concludes that his lack of ability to read and write at a higher level should not and does not stand in the way of his right to make a free, voluntary and informed decision.

> 4. That the court concludes further regarding his anxiety disorders and possible Post Traumatic Stress Disorder that the court

has considered carefully the same and the court does find that they do not render him incompetent to proceed to trial under the normal statutory and constitutional standards and thus, do not render him unable to arrive at the decision to represent himself, as he has previously been found competent.

5. That the court further concludes this day that those disorders as well as the other difficulties he has faced emotionally, psychologically and mentally, do not render him incompetent to proceed to trial or to make this decision.

6. That the court concludes that under the Constitution of the United States and the State of North Carolina, the existing law of the United States as set forth by our Supreme Court in the case law of the State of North Carolina and specifically under the General Statutes of North Carolina, this defendant is entitled to represent himself[.]

The trial court also directed that two attorneys be appointed as standby counsel for defendant.

Defendant's next trial began in May 2005 before a new trial judge, with defendant seated at counsel table and standby counsel seated behind him. Following the selection of twelve jurors and the beginning of the selection of alternate jurors, standby counsel pointed out to the trial judge that the way in which potential jurors were being called appeared to violate statutory law. Defendant moved to excuse the entire jury pool, and the State agreed that such action was most likely proper. The trial court dismissed the seated jurors and ordered that a new *venire* be summoned.

The case recommenced on 1 June 2005, and defendant informed the trial court that he wanted standby counsel to represent him before the jury, but only if such action would not delay the trial. Both standby counsel indicated to the trial court that they were ready to proceed, and the trial moved forward with standby counsel presenting defendant's case to the jury through the end of the guilt-innocence phase of the capital trial. On 8 July 2005, the jury found defendant guilty of first-degree murder based both on malice, premeditation, and deliberation and under the felony murder rule, as well as guilty of first-degree kidnapping, first-degree statutory rape, first-degree statutory sex offense, and indecent liberties. The trial court dismissed the remaining charge of lewd and lascivious conduct.

At the outset of the penalty proceeding, defendant indicated that he had instructed defense counsel to take no part in those proceedings, either by cross-examining the State's witnesses or presenting mitigating evidence in defendant's support. The prosecutor noted that "although [defendant has] lawyers he's told [them] not to act like lawyers," which was "similar" to representing himself. At the prosecutor's request, the trial court reiterated that he had previously questioned defendant about this decision, and determined that defendant was aware of, and competent to waive, his right to counsel.

On 11 July 2005, following a sentencing proceeding in which neither the State nor defendant presented any additional evidence, the jury found two aggravating circumstances regarding the murder, that defendant committed the murder while engaged in the commission of rape, first-degree sexual offense, or kidnapping, and that the murder was especially heinous, atrocious, or cruel. Jurors found one non-statutory mitigator, that defendant has a learning disability. After determining that the mitigating circumstance was insufficient to outweigh the aggravators, the jury recommended death. Defendant was sentenced to death, plus additional lengthy terms of incarceration for the noncapital convictions. That same day the trial court directed that notice of appeal be entered on behalf of defendant with this Court.

On 20 March 2008, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeals from the noncapital convictions. We remanded the case on 12 December 2008 for the trial court to conduct a hearing, in light of *Indiana v. Edwards*, 554 U.S. 164, 171 L. Ed. 2d 345 (2008), issued after defendant's trial, to determine (1) whether defendant fell within the "borderline competent" or "gray area" of mentally ill defendants described in *Edwards*; (2) if so, whether the court in its discretion would have precluded self-representation for defendant and appointed counsel pursuant to *Edwards*; and (3) if so, whether defendant was prejudiced by his period of self-representation. *State v. Lane*, 362 N.C. 667, 668, 669 S.E.2d 321, 322 (2008) (per curiam).

Following the hearing held on remand, the trial court entered extensive findings of fact based on the expert witness testimony from psychiatrists and psychologists for both the State and the defense at the two competency hearings held in the fall of 2004, as well as at the June 2009 hearing. The trial court further made special findings of fact, including that "defendant at all times understood the nature and object of the proceedings against him, comprehended his own situa-

tion in reference to those proceedings, and was able to assist in his defense in a rational manner," such that "any . . . failure regarding his comprehension of his own situation in reference to the proceedings was or would be a result of defendant's willful, volitional failure to consider discovery and the evidence against him."

The Court then concluded that defendant was competent to stand trial and to discharge his counsel and proceed *pro se*. Finding that defendant did not suffer from any mental health disorder or illness as "severe as contemplated in *Edwards* or such that he cannot conduct trial proceedings by himself," the trial court opined that although defendant "present[s] a complex mental health picture," as a matter of law defendant "does not fit the definition of 'gray area' defendant or fit into the category of 'borderline-competent,' " as defined in *Edwards*. That order and the other arguments presented in defendant's appeal as of right from his trial and sentence of death returned to this Court for additional oral arguments on 10 May 2010.

## ANALYSIS

[1] Defendant first argues that the trial court erred by granting his motion to discharge appointed counsel and proceed *pro se* from 23 November 2004 until 1 June 2005. Defendant maintains that the undisputed facts show that, as articulated in *Indiana v. Edwards*, he comes within the category of "gray area" or "borderline competent" defendants who are competent to stand trial but nonetheless lack the capacity to conduct trial proceedings without the assistance of counsel.

The foundational case concerning the right to self-representation is *Faretta v. California*, in which the United States Supreme Court held that the Sixth and Fourteenth Amendments guarantee the right to assistance of counsel and further concluded that a criminal defendant likewise "has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." 422 U.S. 806, 807, 45 L. Ed. 2d 562, 566 (1975). The competence of the defendant in *Faretta* was not in question, because "[t]he record affirmatively show[ed] that [the defendant] was literate, competent, and understanding" in choosing to waive his Sixth Amendment right to counsel. *Id.* at 835, 45 L. Ed. 2d at 582. Nevertheless, the Supreme Court also established that, as with any constitutional right, a defendant must knowingly and voluntarily waive its benefits. *Id.* at 835, 45 L. Ed. 2d at 581-82.

In *Godinez v. Moran,* the Supreme Court refined its holding in *Faretta,* addressing the right to self-representation for those criminal defendants whose competence is at issue. 509 U.S. 389, 391-93, 125 L. Ed. 2d 321, 327-28 (1993). The defendant in *Moran* was found to be competent under the standard articulated in *Dusky v. United States,* 362 U.S. 402, 402, 4 L. Ed. 2d 824, 825 (1960) (per curiam), namely, "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Moran,* 509 U.S. at 392, 125 L. Ed. 2d at 327-28. After finding that the defendant was knowingly and intelligently waiving his right to counsel, the trial court allowed his motion to discharge his attorneys and plead guilty to the capital murder charges against him. *Id.* at 392-93, 125 L. Ed. 2d at 328. Defendant later appealed, arguing that the trial court should not have allowed him to represent himself, as he was not competent to do so.

The Supreme Court "reject[ed] the notion that competence to plead guilty *or to waive the right to counsel* must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Id.* at 398, 125 L. Ed. 2d at 331 (emphasis added). Nevertheless, because the trial court must conduct the additional, second step of inquiring whether such waiver is made knowingly and voluntarily, "[i]n this sense, there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence.*" *Id.* at 400-01, 125 L. Ed. 2d at 333. Having satisfactorily responded to both queries, the defendant in *Moran* was allowed to represent himself and plead guilty. *Id.* at 401-02, 125 L. Ed. 2d at 334.

The Supreme Court has observed that the purpose of this second inquiry is "to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 401 n.12, 125 L. Ed. 2d at 333 n.12; *see also Faretta,* 422 U.S. at 835, 45 L. Ed. 2d at 581-82 ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" (citation omitted)). Accordingly, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself," mean-

ing that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." *Moran,* 509 U.S. at 399-400, 125 L. Ed. 2d at 332-33; *see also Faretta,* 422 U.S. at 834, 45 L. Ed. 2d at 581 ("The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " (citation omitted)).

The Supreme Court considered a related, but distinct, issue in *Indiana v. Edwards,* which involved "a criminal defendant whom a state court found mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself." 554 U.S. at 167, 171 L. Ed. 2d at 350. In *Edwards* the trial court *refused* to allow the defendant to represent himself, *id.* at 169, 171 L. Ed. 2d at 352, and the Court accordingly was faced with whether the State may *deny* the defendant's constitutional right to proceed *pro se* in those circumstances, *id.* at 167, 171 L. Ed. 2d at 350. Defining such a defendant as one whose competence falls into the "gray area" "between *Dusky's* minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose," *id.* at 172, 171 L. Ed. 2d at 354, the Supreme Court reaffirmed its analysis and holding from *Moran* that a gray-area defendant may be *permitted* to represent himself, *id.* at 173, 171 L. Ed. 2d at 355.

Nonetheless, the Court also concluded that "the Constitution permits a State to limit that defendant's self-representation right by insisting upon representation by counsel at trial—on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented." *Id.* at 174, 171 L. Ed. 2d at 355. In such circumstances "judges [may] take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 177-78, 171 L. Ed. 2d at 357. Indeed, the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177, 171 L. Ed. 2d at 357.

This line of cases supports the principle that all criminal defendants, if competent to stand trial, enjoy the constitutional right to

self-representation, as set forth in *Faretta*, though that right is not absolute. For a defendant whose competence is at issue, he must be found to meet the *Dusky* standard before standing trial. If that defendant, after being found competent, seeks to represent himself, the trial court has two choices: (1) it may grant the motion to proceed *pro se*, allowing the defendant to exercise his constitutional right to self-representation, if and only if the trial court is satisfied that he has knowingly and voluntarily waived his corresponding right to assistance of counsel, pursuant to *Moran*; or (2) it may deny the motion, thereby denying the defendant's constitutional right to self-representation because the defendant falls into the "gray area" and is therefore subject to the "competency limitation" described in *Edwards*. 554 U.S. at 175-76, 171 L. Ed. 2d at 355-56. The trial court must make findings of fact to support its determination that the defendant is "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175-76, 171 L. Ed. 2d at 356 (citations omitted).

Even before *Edwards*, North Carolina had established a similar framework through statute and precedent from this Court. *See* N.C.G.S. § 15A-1242 (2009) (enacted in 1977 and permitting a defendant to proceed *pro se* "only after the trial judge . . . is satisfied that [he] . . . [h]as been clearly advised of his right to the assistance of counsel," "[u]nderstands and appreciates the consequences of this decision," and "[c]omprehends the nature of the charges and proceedings and the range of permissible punishments"); *State v. LeGrande*, 346 N.C. 718, 722-23, 487 S.E.2d 727, 729 (1997) ("Before a defendant is allowed to waive appointed counsel, the trial court must insure that . . . . the defendant . . . 'clearly and unequivocally' waive[s] his right to counsel and instead elect[s] to proceed *pro se*. . . . [and] knowingly, intelligently, and voluntarily waive[s] his right to in-court representation." (citations omitted)).

Here defendant was never denied his constitutional right to self-representation because the trial court allowed his motion to proceed *pro se*. As such, the Supreme Court's holding in *Edwards*, that the State may deny that right if a defendant falls into the "gray area" of competence, does not guide our decision here.[1] Rather, after de-

---

1. We recognize that our 2008 order remanding this case instructed the trial court to conduct a hearing in light of the holding in *Edwards*, which was issued while this case was pending on appeal and was thus retroactively applicable. *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661 (1987); *see State v. Morgan*, 359 N.C. 131, 154, 604 S.E.2d 886, 900 (2004), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 79 (2005).

**STATE v. LANE**

[365 N.C. 7 (2011)]

fendant was found competent to stand trial under the *Dusky* standard, and pursuant to the law as set forth in *Faretta, Moran, LeGrande,* and N.C.G.S. § 15A-1242, before allowing defendant's motion to represent himself, the trial court properly conducted a thorough inquiry and determined that defendant's waiver of his constitutional right to counsel was knowing and voluntary.

The transcript reveals that when defendant first indicated he wished to discharge defense counsel and proceed *pro se,* at the beginning of his trial in October 2004, the trial court questioned him about his reasons and sent him to Dorothea Dix Hospital for evaluation of his capacity to do so. In the course of that exchange, the trial court emphasized that it had "to make sure that whatever decision [defendant] make[s], [he] fully understand[s] what [he's] doing" by waiving his right to counsel, "[n]ot just as far as punishment, but as to a trial in and of itself." The trial court also advised defendant of the import of this Court's decision in *State v. Ali,* 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991), which stated that defense attorneys are required to abide by their clients' wishes when there is an absolute impasse over trial tactics or strategy.

Defendant acknowledged to the trial court that he had consistently and regularly chosen to refuse to meet with defense counsel since his incarceration over two years earlier. Defendant further informed the trial court that he had likewise declined to meet with a number of mental health experts. Although defendant told the trial court he wanted to represent himself not because of disagreement over trial strategy but because he simply did not want a lawyer, he withdrew his request less than a week later.

While the trial court was weighing whether to declare a mistrial based on juror misconduct at the beginning of the October 2004 trial, defendant voiced his strong objection to any delay in the proceedings and suggested that if defense counsel moved for a mistrial, he would seek to discharge them. At that time, the trial court and defendant had their longest discussion concerning defendant's beliefs and expectations regarding his trial. Defendant repeatedly indicated that

---

Such remand was appropriate to afford the trial court the opportunity to revisit its decision to allow defendant to proceed *pro se,* because *Edwards* represented a material change in constitutional law by providing the definition of a "gray area" defendant and signaling when a defendant whose competence is at issue may be denied the constitutional right to self-representation. Nevertheless, because the trial court confirmed that it would have granted defendant's motion even with the benefit of the Supreme Court's guidance in *Edwards,* that case is ultimately inapposite.

the did not feel any jury would be able to overlook the age of the victim in this case. Moreover, although defendant believed in his innocence and hoped to be set free, if found guilty he would rather be sentenced to death than to life in prison. However, he also emphasized that this preference "don't make any [sic] crazy, suicidal or incompetent," as he was "a country boy. You lock me down 24 hours, you might as well kill me, plain and simple." At one point defendant also stated, "I'm trying to figure out, sir, what I got to do to prove I'm competent. I went to Dorothea Dix. The doctors say I'm competent. I know what is going on, and I know this man right here [defense counsel] is trying to delay this trial for some reason."

After the trial court declared a mistrial, defendant renewed his motion to discharge counsel and proceed *pro se,* and the trial court had him transferred back to Dorothea Dix Hospital for further evaluation. On 23 November 2004, the trial court conducted a hearing to inquire into defendant's motion. During the hearing, both before and after expert witness testimony, the trial court questioned defendant at length about his reading and writing skills, as well as his understanding of his right to assistance of counsel, the nature of the charges against him, including the possible punishments if he were found guilty of those charges, and the potential consequences of representing himself, such as "forfeit[ing] certain valuable legal rights and legal protections as a result of [defendant's] lack of knowledge" stemming from no legal training. At all times defendant indicated that he was aware of the implications of proceeding *pro se* but that he was nonetheless "freely," "voluntarily," and "intelligently" waiving his right to counsel.

At this hearing the trial court heard from a number of expert witnesses, including Robert Rollins, M.D., who had examined defendant several times at Dorothea Dix Hospital. Dr. Rollins recounted that defendant had indicated his intention to discharge counsel and not put up a defense, as he was "tired" and "ready for it to be over," which comported with earlier representations defendant had made to the trial court objecting to any delay and expressing his wish either to be found not guilty or be sentenced to death.

Dr. Rollins stated his opinion that defendant was competent to make the decision not to put up a defense, even if "it was questionable that [defendant] is acting with a reasonable degree of rational understanding," and despite the diagnosis of several mental disorders, including learning and expressive language disorders, depressive disorder, personality disorder, and alcohol dependence.

Although he did not believe defendant's decision to proceed *pro se* to be either "reasonable or rational," Dr. Rollins nonetheless concluded that "if the test of competency to dismiss his attorneys and represent himself is understanding and appreciating the consequences of the decision, comprehending the nature of the charges and proceedings and range of permissible punishments, in my opinion he's competent."

Dr. Claudia Coleman, a psychologist with whom defendant had mostly refused to meet, also gave her opinion that defendant suffered from post-traumatic stress disorder and severe anxiety disorder and that he did not actually understand the consequences of discharging counsel, notwithstanding his statements to the contrary.[2]

In its order allowing defendant's motion to proceed *pro se*, the trial court found that defendant "has been clearly advised of his right to the assistance of counsel" and "that he understands and appreciates the consequences of his decision and comprehends the nature of the charges and proceedings and the range of permissible punishments, in accordance with [N.C.G.S. §] 15A-1242." The court recognized that defendant "is largely illiterate," noted that it had "pointed out to [defendant] the disadvantages he faces as a result of his limited reading and writing ability," and found that defendant "is well aware of these." Significantly, "[t]he court specifically conclude[d] that [defendant's] lack of ability to read and write at a higher level should not and does not stand in the way of his right to make a free, voluntary and informed decision." Likewise, defendant's "anxiety disorders and possible Post Traumatic Stress Disorder . . . do not render [defendant] unable to arrive at the decision to represent himself, as he has previously been found competent," and "those disorders as well as the other difficulties [defendant] has faced emotionally, psychologically and mentally, do not render him incompetent . . . to make this decision" to proceed *pro se*.[3]

---

2. Dr. Coleman was the sole witness at the hearing on remand from this Court, held on 1 June 2009. She testified to her opinion that defendant was not competent to conduct trial proceedings.

3. In its order on remand concluding that defendant did not fall into the "gray area" defined in *Edwards*, the trial court entered additional findings and conclusions, including that it found Dr. Rollins's testimony to be "more impressive and controlling . . . based upon the more extensive involvement with, opportunity to observe and communication with the defendant." The trial court also found that "[d]efendant can communicate orally in an effective manner . . . . has organized thinking, suffers from no delusions or hallucinations. . . . can concentrate; his orientation is intact, as is his current memory," and he has no "failure to comprehend his own situation."

STATE v. LANE

[365 N.C. 7 (2011)]

We conclude that the trial court's inquiry was sufficient to support its determination that defendant knowingly and voluntarily waived his right to assistance of counsel and chose instead to exercise his constitutional right to self-representation. The orders reflect that the trial court took into full account all the expert witness testimony concerning defendant's functional illiteracy and mental disorders and nonetheless concluded that these conditions did not affect his ability to make the decision to proceed *pro se*. Defendant was repeatedly advised that discharging counsel would likely harm his defense, particularly in light of his limited reading and writing skills, yet he expressed time and again his wish to proceed *pro se*. Likewise, the trial court questioned defendant several times about the reasons underpinning that desire. Although we may disagree with defendant's calculation that a sentence of death is preferable to a lifetime of confinement, we recognize that he reached his decision for his own personal reasons and through his own rational thought process, as he retained the right to do.

Defendant was able to respond to the trial court's inquiries in a manner that indicated that he (1) understood the charges and proceedings against him and the range of possible punishments, (2) had been clearly advised of his right to counsel, and (3) appreciated the consequences of his decision to waive that right. N.C.G.S. § 15A-1242; *see also Moran*, 509 U.S. at 401 n.12, 125 L. Ed. 2d at 333 n.12 (noting that the purpose of the "knowing and voluntary" inquiry is "to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced").

Under *Faretta*, defendant's "technical legal knowledge . . . was not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 836, 45 L. Ed. 2d at 582; *accord LeGrande*, 346 N.C. at 726, 487 S.E.2d at 731. Where, as here, a defendant chooses that right, *Edwards* does not alter that principle.[4] Defendant was well aware of his limitations, and "the record . . . establish[es] that he kn[e]w what he [wa]s doing and his choice [wa]s made with eyes open." *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 582 (citation and internal quotation marks omitted). For the foregoing reasons, we

---

4. Likewise, a criminal defendant who retains counsel remains the ultimate authority on certain aspects of how his defense will be presented. *See State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991) ("[W]hen counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship.").

conclude that the trial court properly allowed defendant's motion to proceed *pro se.*

Defendant next argues that the trial court erred by excluding expert testimony from Dr. Wilkie Wilson, a neuropharmacologist and research scientist who studies the effects of drugs and alcohol on the brain. Dr. Wilson would have testified concerning defendant's pattern of alcohol use and the potential consequences of alcohol withdrawal, including seizures. His testimony was barred by the trial court on relevancy grounds and as a sanction against the defense because the trial court found that the report Dr. Wilson had provided to the State was insufficient to satisfy the rules of discovery.

## Relevancy

[2] Under our Rules of Evidence, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," N.C.G.S. § 8C-1, Rule 401 (2009), and generally "[a]ll relevant evidence is admissible," except as otherwise provided in the law, *id.* Rule 402 (2009). "Evidence which is not relevant is not admissible." *Id.* A trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal. *State v. Wallace,* 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991) (citation omitted), *appeal dismissed and disc. rev. denied,* 331 N.C. 290, 416 S.E.2d 398, *cert. denied,* 506 U.S. 915, 121 L. Ed. 2d 241 (1992); *see also State v. Lawrence,* 352 N.C. 1, 17-18, 530 S.E.2d 807, 817-18 (2000) (reviewing trial court's exclusion of expert witness testimony on behalf of defendant for error and finding none), *cert. denied,* 531 U.S. 1083, 148 L. Ed. 2d 684 (2001).

However, "a determination of relevancy under Rule 401 does not necessarily end the inquiry as to whether a trial court erred in sustaining an objection to proffered expert witness testimony." *State v. Burgess,* 345 N.C. 372, 388, 480 S.E.2d 638, 646 (1997) (citation omitted). Such testimony is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue," N.C.G.S. § 8C-1, Rule 702 (2009), partly explained by this Court as "whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact," *State v. Wilkerson,* 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978) (citation omitted). Although an expert is permitted to offer "[t]estimony in the form of an opinion or infer-

ence" even if it "embraces an ultimate issue to be decided by the trier of fact," N.C.G.S. § 8C-1, Rule 704 (2009), such testimony may properly be excluded if it amounts to no more than pure speculation or conjecture, *State v. Clark*, 324 N.C. 146, 159-60, 377 S.E.2d 54, 62-63 (1989).

Here, during *voir dire* examination, outside the presence of the jury, Dr. Wilson stated that he spent about fifteen to twenty minutes with defendant and his attorney, during which defendant told Dr. Wilson about his drinking history, including that he "drank as much as two cases of beer a day, . . . plus some scotch." Dr. Wilson also recounted that defendant told him he "just didn't remember much about anything," and he drank "just . . . enough alcohol to prevent himself from going crazy and into withdrawal"; otherwise, he would be "sick . . . shaking, . . . very anxious and miserable." When asked whether he discussed with defendant if defendant had understood what he was saying when he confessed to the murder, Dr. Wilson responded in pertinent part:

[N]o, sir that wasn't, that wasn't the issue for me.

. . . I wouldn't be qualified to talk about—my expertise stops at the—I can—I can talk about what generally happens to the brain, what happens to the central nervous system under the influence and withdrawal of drugs. But as for a particular individual at a particular circumstance and me doing some kind of examination of him, that would be beyond my level of expertise.

So I'm not—I'm not qualified to talk to [defendant] about how he was feeling at [the time of his confessions to law enforcement] and whether or not [sic] make some evaluation of the quality of what he said or those circumstances.

I can only tell you in general what happens to people in various circumstances, such as intoxication or alcohol withdrawal. But I can't tell you, there was no sense in me talking to [defendant] about [his crime or confession]. I wasn't really interested in what he said or whatever else.

. . . .

I was asked to come in and talk about his alcohol use, alcohol use at that level, and the consequences of withdrawing from that alcohol abuse; and that's what I was interested in.

Dr. Wilson then continued that his "ultimate opinion [wa]s . . . that [defendant] used alcohol at a profoundly high level. So high in fact that when he stopped using alcohol the central nervous system reacted by becoming hyperexcitable and going [] into alcohol withdrawal," which would produce other symptoms like anxiety and a rise in blood pressure and heart rate, perhaps resulting in a seizure.

Dr. Wilson repeatedly stated that he "d[id] not have any evidence that [defendant] in this circumstance had this kind of hyperexcitability on-going" when defendant made his confession; nor could Dr. Wilson "tell you what was going on in [defendant's] brain at that time." Thus, Dr. Wilson admitted that "what [defendant] said I have no way of evaluating" and that he "can only tell you that people that are going through alcohol withdrawal have very disturbed brain function." In response to a question from defense counsel, Dr. Wilson said he did not have the expertise to determine whether defendant's confession was false based on defendant's being in a state of alcohol withdrawal when the confession was made; he also averred that he was not there to offer any testimony to that effect.

At the conclusion of voir dire, the trial court ruled that Dr. Wilson's testimony was not relevant during the guilt-innocence phase of defendant's trial because Dr. Wilson could not "state opinions of the defendant's mental condition at the time of the interrogation." The trial court observed that Dr. Wilson was unable to say if defendant's confession was true or false or whether it was induced, and an earlier pretrial order by another judge had already determined the confession to be voluntary. As such, and emphasizing again that Dr. Wilson had repeatedly stated that he could not "render an opinion as to whether the confession was false or true" or what defendant's condition was at the time he made his confession, the trial court excluded the testimony.

In light of our deferential standard of review, we are not persuaded that the trial court erred in excluding Dr. Wilson's testimony. Defense counsel argued that the proffered testimony was relevant to the jury's consideration of "the overall reliability of the confession." However, Dr. Wilson could offer no opinion about the severity of any symptoms defendant may have been experiencing at the time of his statement, nor did he indicate that those symptoms—if they occurred—would have made defendant more susceptible to suggestion or somehow caused him to confess falsely to raping and murdering a five-year-old girl.

At that point in the trial, the jury had previously heard from detectives regarding defendant's demeanor and comportment during their interviews with him and when he made his confession. Each detective stated his belief that defendant was not intoxicated at the time of law enforcement's interactions with him, which supported defendant's averments to them that he had not been drinking. Detectives did recount, however, that defendant reported that he had consumed twelve beers the night before and that he felt sick and hung over when they picked him up on the morning of the day he ultimately confessed. Two officers from the Wayne County Detention Center likewise testified that defendant stated he was not impaired nor did he seem to be impaired when he was booked and processed, but they confirmed that defendant appeared to suffer a seizure shortly after going outside for a cigarette before being taken to his cell. Defendant's stepmother also testified about defendant's heavy drinking, albeit in general terms.

Dr. Wilson repeatedly stated that he could not offer an opinion whether this particular defendant, at the time he made his confession, was experiencing any specific symptoms of alcohol withdrawal. Rather, he could only say that defendant was an extremely heavy drinker and that heavy drinkers generally experience certain effects on their nervous systems when withdrawing from alcohol. Given the earlier evidence from detectives about defendant's condition, as well as testimony from defendant's stepmother concerning his alcoholism, the jury could already assess how withdrawal from alcohol affected the reliability of defendant's confession, if at all.

In sum, Dr. Wilson's testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue," N.C.G.S. § 8C-1, Rule 702, and would instead have likely suggested that defendant was definitively experiencing particular withdrawal symptoms. Furthermore, Dr. Wilson could not testify regarding the existence of a direct connection between any such symptoms and the reliability of defendant's confession. Accordingly, this testimony was properly excluded by the trial court under Rule 401. As we held in *State v. Lawrence*, we conclude here that "[h]aving the expert testify as requested by defendant would tend to confuse, rather than help, the jury." 352 N.C. at 17-18, 530 S.E.2d at 818; *see also State v. Weeks*, 322 N.C. 152, 165-67, 367 S.E.2d 895, 903-04 (1988) (concluding that when the defendant sought testimony from psychiatrists and a psychologist not only to describe his mental disorders, but also to define his state of mind at the actual time of the killings with which he

was charged, the latter testimony was properly barred because it would have allowed "the experts [to] tell the jury that certain legal standards had not been met").

## Discovery Sanction

[3] The trial court also excluded Dr. Wilson's testimony pursuant to its authority under N.C.G.S. § 15A-910, which states:

(a) If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article or with an order issued pursuant to this Article, the court in addition to exercising its contempt powers may

(1)   Order the party to permit the discovery or inspection, or

(2)   Grant a continuance or recess, or

(3)   Prohibit the party from introducing evidence not disclosed, or

(3a)  Declare a mistrial, or

(3b)  Dismiss the charge, with or without prejudice, or

(4)   Enter other appropriate orders.

(b) Prior to finding any sanctions appropriate, the court shall consider both the materiality of the subject matter and the totality of the circumstances surrounding an alleged failure to comply with this Article or an order issued pursuant to this Article.

N.C.G.S. § 15A-910 (2009). We review such a decision for abuse of discretion. *See State v. Thomas*, 291 N.C. 687, 692, 231 S.E.2d 585, 588 (1977) ("Imposition of these sanctions rests entirely within the discretion of the trial judge. The exercise of that discretion, absent abuse, is not reviewable on appeal." (citations omitted)).

The record and transcripts from the pretrial and trial proceedings in this case reflect an ongoing issue related to the State's receipt of final reports from potential defense expert witnesses. On 8 January 2004, the State filed a motion for production of such reports, noting that "it has been the experience [of the prosecutors] in previous capital murder trials that defense experts rarely produce a written report of their findings and examinations" and requesting an order "requiring any defense experts to be called at trial to prepare written reports

of their findings and to provide said reports, findings and any raw data used in the compilation and formulation of said findings to the State's attorneys prior to trial." That motion was allowed on 2 February 2004, and the defense was ordered to provide the reports and data no later than thirty days before trial was scheduled to begin in May 2004.

Nevertheless, the defense did not provide any reports, and after the trial was continued past the May 2004 date, the trial court again ordered defendant to submit to the prosecution by 6 August 2004 "any and all reports of experts which the defendant intends to call at the trial of this matter." On 6 August, the State received "a Fax from the defendant's attorney purporting to be several 'preliminary reports,' each indicating the need for further information upon which to give expert opinions," yet the State received nothing further from the defense as of 24 September 2004, about two weeks before the scheduled start date of the new trial. The State then filed another motion to compel discovery, which the trial court allowed on 27 September 2004, again ordering the defense to provide "any and all reports of experts which the defendant intends to call during any portion of the trial or sentencing of this matter . . . by **October 6, 2004**."

The State continued to raise the issue as the trial opened in mid-October 2004 and again after defendant's new trial began in May 2005. Toward the end of jury selection, after defendant had asked that standby counsel resume serving as his attorneys, defense counsel alerted the trial court that they might need some additional time to prepare their experts, as these potential witnesses "had stopped doing whatever they were doing" the previous fall, after defendant's first trial had been suspended. The prosecutor then reminded the trial court that he had already mentioned on several occasions that he had received only partial reports from the defense's potential expert witnesses. He added:

> I want to make sure I keep everybody on alert we fully intend that all discovery would be complied with. I'm not complaining about [defense counsel]. I know they have issues to deal with but I fully plan to object when somebody whips out a report or starts to give some report and haven't prepared a written report.

Defense counsel agreed with what the State was entitled to and promised they would "do [their] best." The prosecutor observed that more than a year had passed since the trial court had entered orders compelling defense compliance with discovery, and he added that the

law had since changed, making such compliance a statutory requirement. In response to this exchange, the trial court stated:

> I will say to the defendant I tried my best so far to bend over backward to be fair to [defendant]. Everybody needs to understand I'll try to bend over equally backwards to be fair to the state. You know, rules will have to be complied with at least in spirit . . . .
>
> . . .
>
> . . . . I want the state to be [] able to put on what they need to put on. I want [the defense] to be able to put on what [the defense] need[s] to put on. It's not going to be a trial by ambush on either side.

Defense counsel acknowledged their responsibilities, and the trial moved forward from there, with the prosecutor raising the issue of expert witness reports on at least one other occasion.

On 1 July 2005, near the close of the State's case-in-chief and in anticipation of defendant's presentation of evidence, defense counsel informed the trial court of their intention to call two expert witnesses and asserted that the prosecutor had these witnesses' reports. With respect to Dr. Wilson, however, the prosecutor stated he was "not in receipt of what [he] consider[ed] to be a report" and had only been provided "a slightly longer than one page, slightly double-spaced letter" from defense counsel and an e-mail from Dr. Wilson. Defense counsel maintained that the e-mail was the final report. The trial court told defense counsel that the rules require "more than a cursory report, some summary of his testimony and conclusions" and then instructed, "I want to give you fair warning that if [the prosecutor] doesn't have a report and the witness gets up here and starts testifying beyond that, . . . the rule says I stop it."

On 6 July 2005, when the defense sought to call Dr. Wilson as an expert witness, the State immediately objected. Defense counsel stated that Dr. Wilson would not be testifying to any subjects outside the scope of the e-mail report previously provided to the prosecutor, but also observed that Dr. Wilson might be asked "hypothetical questions of the testimony that's already been given in the trial." The State then read into the record the first paragraph of the e-mail Dr. Wilson had sent:

> Dear [defense counsel]: You asked for a report of my findings in the case of [defendant]. This e-mail, which [sic] is a prelimi-

nary report of the materials that I have reviewed, my conversation with [defendant] and the conclusions that I have reached at this time. I will continue working on this case until I testify, and I will use e-mail to keep you updated about any new conclusions that I reach.

The prosecutor added, "I must have stood up 15 times during the course of this trial . . . on the record as well as off and asked for the continuation of the final report, or whatever it is we're talking about here, and I haven't gotten anything else." After allowing the State to question Dr. Wilson on voir dire, outside the presence of the jury, the trial court issued a ruling that "there is no report furnished with the opinions to the State, which is violative of the discovery rules, and that the report furnished is incomplete based on the opinions stated."

The report itself is not in the record. Thus, we are unable to determine whether the trial court's ruling that Dr. Wilson's proposed testimony was outside the scope of his "preliminary report" is incorrect. Nevertheless, we note that Dr. Wilson also testified during voir dire that defense counsel had never requested that he write a subsequent or follow-up report. Moreover, the trial court had already pursued other measures contemplated by N.C.G.S. § 15A-910, including issuing an order to compel, allowing several extensions of time to provide the requisite final reports, and repeatedly warning that such testimony would be excluded if a final report was not provided. The statute further directs a trial court to balance any sanction for failure to comply against "the materiality of the subject matter and the totality of the circumstances surrounding an alleged failure to comply." N.C.G.S. § 15A-910(b). In light of the trial court's ruling that Dr. Wilson's testimony was irrelevant, in which we have already found no error, we believe the trial court struck the appropriate balance here as to materiality, and we see no abuse of discretion in the sanction imposed on defendant.

[4] Next, defendant argues that the trial court committed prejudicial error by failing to submit the statutory mitigating circumstance in N.C.G.S. § 15A-2000(f)(1), that defendant "has no significant history of prior criminal activity," thereby entitling him to a new sentencing proceeding.

In *State v. Hurst* we reviewed the case law concerning the (f)(1) mitigating circumstance and stated:

We reaffirm that the (f)(1) circumstance must be submitted whenever the trial court finds substantial evidence on which a

reasonable jury could determine that a defendant has no significant history of prior criminal activity. However, when the judge makes a threshold determination supported by findings on the record that no rational jury could find a defendant's criminal history to be insignificant and declines to instruct as to (f)(1), that determination is entitled to deference. Therefore, whenever a party contends that the trial court erred in deciding not to provide an (f)(1) instruction, we will review the whole record in evaluating whether the trial court acted correctly, bearing in mind our admonition that any reasonable doubt regarding the submission of a statutory or requested mitigating factor should be resolved in favor of the defendant. Although the doctrine of invited error does not apply, as noted above, a whole record review will necessarily include consideration of the parties' positions as to whether the instruction should be given.

360 N.C. 181, 197, 624 S.E.2d 309, 322 (alteration in original) (internal citation and internal quotation marks omitted), *cert. denied*, 549 U.S. 875, 166 L. Ed. 2d 131 (2006). We noted as well that "substantial evidence" is "of such a nature that ' "a rational jury could conclude that defendant had no *significant* history of prior criminal activity," ' " *id.* at 194, 624 S.E.2d at 320 (quoting *State v. Barden*, 356 N.C. 316, 372, 572 S.E.2d 108, 143 (2002) (citations omitted), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003)), and "significant" is in turn defined as " 'likely to have influence or effect upon the determination by the jury of its recommended sentence,' " *id.* (quoting *State v. Walls*, 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995) (citation omitted), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996)).

During the penalty proceeding, defendant instructed his counsel not "to take any position or make any requests or otherwise advocate." Nevertheless, at the outset of the sentencing proceeding, defense counsel stated for the record two actions that he maintained "we would have or should have done" had they been allowed by defendant to do so: (1) object to any State attempt to have the trial court instruct the jury on the statutory aggravating circumstance in N.C.G.S. § 15A-2000(e)(3), that defendant had previously been convicted of a violent felony, namely, the felonious restraint of his former wife, and (2) seek to exclude certain evidence from defendant's former spouse about the tumultuous nature of their relationship.

In response to the trial court's queries about the forecast of testimony by defendant's former wife, the State maintained that she

would recount an incident on 29 September 1998, when defendant "kidnapped his exwife [sic] from a convenient [sic] store by the use of force and violence, and took her to a wooded area . . . and the activities which occurred during the time . . . that he held her." Following review of police reports about the matter, the trial court stated that "the testimony would be very restricted" and could not refer to whether defendant had a knife, any prior assaults by defendant on his former wife, or any type of spousal abuse that did not rise to the level of a felony, as contemplated by the (e)(3) aggravating circumstance. However, after the State argued that the statements did not sufficiently reflect the violent nature of the incident, the trial court agreed to hear voir dire testimony from defendant's former wife.

The trial court heard the voir dire testimony and again ruled that defendant's former wife would not be allowed to "testify about the weapon, the lotion or the sexual activity" but could describe the incident that gave rise to defendant's conviction for felonious restraint as well as speak generally about domestic violence in their marriage without providing details of any specific instances. In light of those limitations, the State decided not to seek an instruction on the (e)(3) aggravating circumstance and did not have defendant's former wife testify before the jury.

When discussion turned to the mitigating circumstances that would be presented, the trial court initially indicated it would submit the (f)(1) mitigator to the jury. Although the jury had earlier heard about defendant's two prior convictions for driving while impaired and his felonious restraint conviction, the trial court stated its conclusion that "under the testimony the jury can find one way or the other." However, the trial court also considered that defendant had not requested the instruction, as well as the State's averment that if the (f)(1) mitigator was given, the prosecution would seek to introduce evidence of the felonious restraint conviction after all, meaning the testimony of defendant's former wife would be heard by the jury.[5]

---

5. The transcript reflects that the grounds for the trial court's exclusion of certain portions of the ex-wife's testimony, namely, that defendant had a knife and a bottle of lotion and forced her into sexual activity, were that those facts were outside the scope of defendant's conviction for felonious restraint and thus inadmissible with respect to submission of the (e)(3) aggravating circumstance. However, although not explicitly discussed, given that the (f)(1) mitigating circumstance refers to "prior criminal *activity*," these portions likely would have been allowed into evidence by the trial court in reference to that mitigator. Indeed, the State makes this very point in its brief to this Court.

**STATE v. LANE**

[365 N.C. 7 (2011)]

She had recounted that defendant had forcibly restrained her inside a car, driven her to a wooded area, kept her there for some time using physical threats and a knife, and coerced her into sexual activity based on her fear for her safety. She also testified that there had been physical and sexual violence during their marriage. Following this discussion, the trial court decided not to instruct the jury on the (f)(1) mitigating circumstance.

In light of the deference to be accorded the trial court, as articulated in *Hurst*, the forecast evidence sufficiently supports the trial court's threshold determination that no rational jury would have found that defendant's prior criminal activity was insignificant. Our review of the whole record finds no error in the trial court's conclusion that testimony that defendant had violently abducted his former wife and forced her to engage in sexual activity was " 'likely to have influence or effect upon the determination by the jury of its recommended sentence.' " *Hurst*, 360 N.C. at 194, 624 S.E.2d at 320 (citation omitted). The trial court properly balanced the potentially severely prejudicial effect of the testimony of defendant's former wife against defendant's failure to request the instruction and any possible mitigating value from submission of the (f)(1) circumstance.

## PRESERVATION ISSUES

Defendant raises three additional issues that he concedes have previously been decided by this Court contrary to his position, urging us to reexamine our prior analysis while preserving his right to argue these issues on federal review of his case: (1) that the trial court erred by instructing the jury that they had to be unanimous in their response to Issue Four, namely, that the aggravating circumstances were not sufficiently substantial to impose the death penalty when considered with the mitigating circumstance; (2) that the trial court erred by instructing the jury that if it answered "yes" to Issue Four, it had the "duty" to impose the death penalty; and (3) that the trial court erred in its definition of mitigating circumstances.

Having considered defendant's arguments, we see no reason to revisit or depart from our earlier holdings. *See State v. McCarver*, 341 N.C. 364, 388-94, 462 S.E.2d 25, 38-42 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996) (rejecting the argument that the instruction on a unanimous answer to Issue Four is error); *State v. Skipper*, 337 N.C. 1, 57, 446 S.E.2d 252, 283 (1994) (rejecting the argument that it is error for the trial court to instruct the jury that it is the jury's duty to recommend a death sentence if it answers "yes"

to Issue Four (citations omitted)), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995), *superseded on other grounds by statute,* N.C.G.S. § 15A-2002, *as recognized in State v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied,* 514 U.S. 1021, 131 L. Ed. 2d 224 (1995); *State v. Robinson,* 336 N.C. 78, 121-22, 443 S.E.2d 306, 327-28 (1994) (rejecting the argument that the definition of mitigating circumstances is erroneous), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

## PROPORTIONALITY REVIEW

[5] In accordance with statute, we last consider whether the record supports the aggravating circumstances found by the jury, whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2009).

The jury found both of the aggravating circumstances submitted for its consideration: (1) the murder was committed while defendant was engaged in the commission of rape, first-degree sexual offense, or kidnapping, N.C.G.S. § 15A-2000(e)(5); and (2) the murder was especially heinous, atrocious, or cruel, *id.* § 15A-2000(e)(9). After a thorough examination of the transcripts, record on appeal, briefs, and arguments of counsel, we conclude that the jury's finding of these circumstances beyond a reasonable doubt was fully supported by the evidence. The jury also found the mitigating circumstance that defendant suffered from a learning disability, but did not find the catchall mitigating circumstance.

Defendant maintains in his brief to this Court that his death sentence should be vacated because it was "imposed under the influence of passion, prejudice and other arbitrary factors," yet fails to present any argument in support of this position or direct this Court to anything in the record or transcripts that would support such a ruling. Our own careful review has likewise revealed no such arbitrary influence.

Finally, "we must determine whether the death sentence was excessive or disproportionate by comparing the present case with other cases in which we have found the death sentence to be disproportionate." *Hurst,* 360 N.C. at 207, 624 S.E.2d at 328 (citing *State v. Smith,* 359 N.C. 199, 223, 607 S.E.2d 607, 624, *cert. denied,* 546 U.S. 850, 163 L. Ed. 2d 121 (2005)); N.C.G.S. § 15A-2000(d)(2). Defendant

asserts that these standards for proportionality review are unconstitutionally vague and arbitrary, an argument that we considered and rejected in *State v. Garcia*, 358 N.C. 382, 429, 597 S.E.2d 724, 756 (2004) (citation omitted), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005), and decline to revisit here.

This Court has held the death penalty to be disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 487-89, 573 S.E.2d 870, 897-99 (2002); *State v. Benson*, 323 N.C. 318, 328-29, 372 S.E.2d 517, 522-23 (1988); *State v. Stokes*, 319 N.C. 1, 19-27, 352 S.E.2d 653, 663-68 (1987); *State v. Rogers*, 316 N.C. 203, 234-37, 341 S.E.2d 713, 731-33 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 676-77, 483 S.E.2d 396, 414, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 573, 364 S.E.2d 373, 375 (1988); *State v. Young*, 312 N.C. 669, 686-91, 325 S.E.2d 181, 192-94 (1985); *State v. Hill*, 311 N.C. 465, 475-79, 319 S.E.2d 163, 170-72 (1984); *State v. Bondurant*, 309 N.C. 674, 692-94, 309 S.E.2d 170, 181-83 (1983); and *State v. Jackson*, 309 N.C. 26, 45-47, 305 S.E.2d 703, 716-18 (1983). We conclude that this case is not substantially similar to any of these cases.

Here defendant confessed to taking advantage of a trusting five-year-old child, then raping and sodomizing her before putting her, while still alive, in a garbage bag sealed with duct tape, wrapping her in a tarp, and discarding her body in a creek. Unlike *Stokes*, in which this Court found the death sentence to be excessive and disproportionate despite a finding of the (e)(9) aggravating circumstance, this defendant was neither a juvenile nor was he acting with an older accomplice. Similarly, unlike *Bondurant*, in which this Court likewise vacated the death sentence, this defendant did nothing to seek medical assistance for the victim or otherwise help her before she succumbed to what he claimed was an accidental death.

We have also held that the (e)(9) aggravating circumstance is "sufficient, standing alone, to affirm a death sentence," *State v. Morgan*, 359 N.C. 131, 174, 604 S.E.2d 886, 912 (2004) (citations omitted), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 79 (2005), as is the (e)(5) aggravating circumstance, *State v. Zuniga*, 320 N.C. 233, 274-75, 357 S.E.2d 898, 923-24, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). In addition, defendant was found guilty of both felony murder and first-degree murder done with premeditation and deliberation, either of which may be punished by death, but " ' finding of premeditation and deliberation indicates a more calculated and cold-blooded crime' for which the death penalty is more often appropri-

ate." *State v. Taylor*, 362 N.C. 514, 563, 669 S.E.2d 239, 276 (2008) (citations omitted), *cert. denied*, U.S. , 175 L. Ed. 2d 84 (2009).

We note as well that, after comparing defendant's case with those in which we have found the death sentence to be proportionate, *State v. Al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005), *cert. denied*, 547 U.S. 1076, 164 L. Ed. 2d 528 (2006), we find defendant's case to be more analogous to these cases. After considering "all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison," *State v. McNeill*, 360 N.C. 231, 254, 624 S.E.2d 329, 344 (citing *Al-Bayyinah*, 359 N.C. at 760-61, 616 S.E.2d at 514), *cert. denied*, 549 U.S. 960, 166 L. Ed. 2d 281 (2006), our sound judgment and experience leads us to conclude that the death sentence imposed here is not excessive or disproportionate, taking into account both the crime and the defendant, *id.* at 253, 624 S.E.2d at 344 (citing *Garcia*, 358 N.C. at 426, 597 S.E.2d at 754).

## CONCLUSION

For the foregoing reasons we find that defendant received a fair trial and capital sentencing proceeding free of prejudicial error, and the death sentence recommended by the jury and imposed by the trial court is not excessive or disproportionate.

NO ERROR.

Justice JACKSON took no part in the consideration or decision of this case.