HUNTER, JR., ROBERT N., Judge.
 

 *414
 
 Ezekiel Gamble ("Defendant") appeals following a jury verdict convicting him of armed robbery in which he received a sentence of 80 to 108 months' imprisonment. On appeal, Defendant argues the trial court committed plain error in allowing eyewitness testimony in violation of the North Carolina Eyewitness Identification Reform Act of 2007 ("EIRA").
 

 *415
 
 Defendant also argues he received ineffective assistance of counsel at trial. After review we find the court committed no error, much less plain error in admitting the eyewitness testimony. We dismiss Defendant's ineffective assistance of counsel claim without prejudice to the right of Defendant to refile a motion for appropriate relief in the trial court.
 

 I. Factual and Procedural History
 

 On 20 May 2013, Defendant was indicted for armed robbery. Represented by appointed counsel, Wayne T. Baucino, Defendant pled not guilty, and trial began on 26 August 2014 in Guilford County Superior Court.
 

 The State's evidence tended to show the following: On 11 December 2012, Maurice Stimpson lived in an apartment complex in Greensboro, North Carolina. While cleaning inside his home during the early afternoon, he heard the sound of another person outside his home. Mr. Stimpson went outside and saw Defendant running around the building searching for someone. Mr. Stimpson watched Defendant run around for fifteen minutes, and went back inside to finish his cleaning. Shortly thereafter, Defendant knocked on Mr. Stimpson's door. Defendant asked Mr. Stimpson where "Rob" lived, and Mr. Stimpson pointed out Rob's apartment. Then Defendant left with another man in a white Lexus.
 

 About thirty minutes later, Defendant knocked on Mr. Stimpson's door again, asking about Rob. Mr. Stimpson walked outside to talk with Defendant. Once outside, Mr. Stimpson turned and saw a second man standing beside the front door. The second man was holding, but not pointing, a gun. Defendant told Mr. Stimpson to call Rob, and Mr. Stimpson obliged, telling Rob to come home and that two men were looking for him. As soon as Mr. Stimpson hung up, Defendant became upset and "got in [Mr. Stimpson's] face." Defendant insisted on being taken to Rob, but Mr. Stimpson refused. Defendant responded by demanding Mr. Stimpson's wallet. Mr. Stimpson protested to keep his money and reluctantly took out his wallet. Defendant took the wallet from Mr. Stimpson's hand, and removed all of the money, saying, "Somebody got to take the loss today." Defendant then returned the cashless wallet to Mr. Stimpson. The second man with the gun told Mr. Stimpson to take out his I.D. and put it in the man's pocket, which Mr. Stimpson did. Defendant and his accomplice left, and Mr. Stimpson went inside his home and called the police. During Mr. Stimpson's direct testimony, he identified Defendant as his assailant three times. This testimony elicited no objection from defense counsel.
 

 *416
 
 Officer M.L. Schlanger of the Greensboro Police Department responded to the 911 call, and met with Mr. Stimpson. Mr. Stimpson detailed the events leading up to the robbery,
 
 *161
 
 the .38 caliber handgun used in the robbery, and the white Lexus he saw earlier that day. Mr. Stimpson described the robber as an African-American male in his early twenties, with dreadlock style hair, and a white t-shirt. Officer Schlanger and other officers canvassed the apartment complex and found a witness who gave them the license plate number for the suspect's white Lexus. Officer Schlanger ran the license plate number and found it registered to Tynisha Fordham of Thomasville, North Carolina. Officer Schlanger spoke with Detective Curry of the Thomasville Police Department, and informed him of the armed robbery, and asked him to be on the lookout for the suspects and the white Lexus. Detective Curry knew the Lexus owner, Tynisha Fordham, and her brother, Johnston. Detective Curry stated Defendant knew Johnston and Fordham, and Defendant fit the description of the robber. Using this information Officer Schlanger suspected Defendant as a target for further investigation.
 

 Detective Scott Russell of the Greensboro Police Department contacted Mr. Stimpson on 12 December 2012 to arrange a meeting to conduct a photographic lineup. Detective Russell used the information Officer Schlanger had put together to select photographs of eight African-American men in their early twenties with dreadlocks, including Defendant. Detective Russell prepared the photographic lineup before meeting with Mr. Stimpson on 13 December 2012 as follows:
 

 I had eight photographs, but I only used six of those photographs. And what I do, I take one photograph of the possible suspect and five filler photographs of other individuals of similar color, weight, characteristics. And what I do, prior to arriving at Mr. Stimpson's house, I place one photograph in six separate [plain manila] folders. At that point, what I do is I shuffle those.... That's so I don't know which photograph is going to be the suspect.... I don't make any gestures or inferences to the victim in this case trying to pick out an alleged suspect.
 

 Detective Russell arrived at Mr. Stimpson's residence to conduct the lineup. Detective Russell began by reading the instructions found in section 15A-284.52(b)(3) of the EIRA. Following the instructions, Detective Russell told Mr. Stimpson that he should not feel compelled to make an identification, that it is important to exclude innocent persons, and that the investigation would continue whether or not an identification was made. Both men signed, acknowledging the instructions on a form.
 

 *417
 
 Detective Russell reshuffled the folders with photos. He then showed the photos to Mr. Stimpson. When Mr. Stimpson came to Defendant's picture, he said, "That's the one." Detective Russell asked Mr. Stimpson how sure he was on a scale of one to ten and Mr. Stimpson answered, "10 out of 10." The State offered all eight photos and the signed instruction sheet into evidence. This testimony elicited no objection from defense counsel.
 

 Following Detective Russell's photographic lineup, an arrest warrant was issued charging Defendant with armed robbery. Defendant was arrested and served with the warrant on 27 January 2013. Defendant posted bond shortly thereafter.
 

 Officer Zach Trotter of the High Point Police Department testified to Defendant's second arrest, stemming from a traffic stop while Defendant was out on bond for the armed robbery charge. On 9 February 2013, Defendant drove alone in High Point, North Carolina. Officer Trotter noticed the car had expired registration tags, and pulled it over. After stopping the car, Defendant fled on foot. In a subsequent search of the car, police found a chrome .38 caliber revolver underneath the front passenger seat. Following the traffic stop, Defendant was arrested and charged with crimes unrelated to the current appeal. While being processed at the jail for these charges, Defendant voluntarily told Officer Trotter the following:
 

 Man, I can't take this gun charge. I'm going to trial for a robbery in Greensboro soon and they are going to think that the gun-that gun is the gun I used in the robbery because it's the same gun-I mean, it's the same type of gun that was used.
 

 Defense counsel cross-examined Officer Trotter about the statement, focusing primarily on Officer Trotter's note taking. The revolver
 
 *162
 
 was admitted into evidence during Officer Trotter's direct examination without objection.
 

 The State rested its case and defense counsel moved to dismiss the armed robbery charge on grounds of insufficient evidence. The trial court denied Defendant's motion to dismiss.
 

 Defendant did not testify in his own defense. However, defense counsel recalled Officer Trotter to ask additional questions about his note taking. Defendant called several witnesses for the defense, including Helen Mock, Defendant's mother, Tynisha Fordham, the Lexus owner, and Brittany Davis, Defendant's former girlfriend. Defendant rested his
 
 *418
 
 case, and at the close of evidence, he renewed his motion to dismiss for insufficient evidence. The trial court denied the renewed motion and began the charge conference.
 

 During the charge conference, Defendant requested an instruction on the identification of Defendant as the perpetrator of the crime under N.C.P.I.-Crim. 104.90. The court granted Defendant's request, instructing the jury:
 

 I instruct you that the State has the burden of proving the identity of the defendant as the perpetrator of the crime charged beyond a reasonable doubt. This means that you, the jury, must be satisfied beyond a reasonable doubt that the defendant was the perpetrator of the crime charged before you may return a verdict of guilty.
 

 Although N.C.P.I.-Crim. 105.65 could have been used, Defendant did not request any other instructions pertaining to the EIRA, and did not object to the omission of any EIRA instructions. After closing arguments, the trial court charged the jury and sent the jury out for deliberation. During deliberation, the jury requested the eight photos from the lineup and Defendant raised no objection. The trial court gave the photos to the jury, and deliberation continued for approximately three hours before the jury reached a unanimous guilty verdict.
 

 The court held the sentencing hearing the next morning, on 28 August 2014. Both parties stipulated to Defendant's prior record level III, for two prior robberies in 2009 and 2011. Defendant delivered his allocution to the court, maintaining his innocence and providing brief insights into his prior robbery convictions. The court imposed a sentence within the presumptive range of the Class D armed robbery felony, sentencing Defendant to 80 to 108 months' imprisonment. Defendant immediately entered his notice of appeal by oral motion, and requested appointed appellate counsel. The court appointed the Appellate Defender.
 

 II. Standard of Review
 

 On appeal, Defendant claims the trial court committed plain error in allowing Detective Russell's testimony, the evidence from the photographic lineup, Mr. Stimpson's in-court identification, and jury instructions that did not discuss the EIRA. Defendant did not preserve any of these claims by objection at trial. On appeal he asked that we review the admission of eyewitness testimony for plain error.
 

 In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved
 
 *419
 
 by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.
 

 N.C.R.App. P. 10(a)(4) ;
 
 see also
 

 State v. Goss,
 

 361 N.C. 610
 
 , 622,
 
 651 S.E.2d 867
 
 , 875 (2007),
 
 cert. denied,
 

 555 U.S. 835
 
 ,
 
 129 S.Ct. 59
 
 ,
 
 172 L.Ed.2d 58
 
 (2008). Plain error review is to be " 'applied cautiously and only in the exceptional case ...' [meaning] the error will often be one that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' "
 
 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (quoting
 
 State v. Odom,
 

 307 N.C. 655
 
 , 660,
 
 300 S.E.2d 375
 
 , 378 (1983) ).
 

 "The North Carolina plain error standard of review ... requires the defendant to bear the heavier burden of showing that the error rises to the level of plain error."
 
 Lawrence,
 

 365 N.C. at 516
 
 ,
 
 723 S.E.2d at 333
 
 . "For an error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial."
 

 *163
 

 Id.
 
 at 518,
 
 723 S.E.2d at 334
 
 . Next, "a defendant must establish prejudice-that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' "
 

 Id.
 

 (quoting
 
 Odom,
 

 307 N.C. at 660
 
 ,
 
 300 S.E.2d at
 
 378 ).
 

 III. Analysis
 

 "[E]yewitness identification evidence has a powerful impact on juries. Juries seem most receptive to, and not inclined to discredit, testimony of a witness who states that he saw the defendant commit the crime."
 
 Watkins v. Sowders,
 

 449 U.S. 341
 
 , 352,
 
 101 S.Ct. 654
 
 , 661,
 
 66 L.Ed.2d 549
 
 (1981) (Brennan, J., dissenting). North Carolina courts have long recognized this impact, and provided neutral lineup and confrontation procedures to protect suspects' Due Process rights under the Fifth and Fourteenth Amendments of the United States Constitution and Art. I § 19 of the North Carolina Constitution.
 
 State v. Hannah,
 

 312 N.C. 286
 
 , 290,
 
 322 S.E.2d 148
 
 , 151 (1984) ;
 
 see also
 

 State v. Harris,
 

 308 N.C. 159
 
 ,
 
 301 S.E.2d 91
 
 (1983).
 

 When "lineup and confrontation procedures [are] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification [they] violate due process and are constitutionally unacceptable."
 
 State v. Smith,
 

 278 N.C. 476
 
 , 481,
 
 180 S.E.2d 7
 
 , 11 (1971) (citation and quotation marks omitted). Under a Due Process analysis, the North Carolina Supreme Court has provided a two-part framework:
 

 *420
 
 First we must determine whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification. If this question is answered in the negative, we need proceed no further. If it is answered affirmatively, the second inquiry is whether, under all the circumstances, the suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification.
 

 Hannah,
 

 312 N.C. at 290
 
 ,
 
 322 S.E.2d at 151
 
 (citations omitted).
 

 The North Carolina Supreme Court has developed a totality of the circumstances test to determine if a pretrial procedure was impermissibly suggestive, defining impermissible suggestiveness as "so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice."
 

 Id.
 

 (citations omitted). In making this determination courts consider several factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.
 
 Harris,
 

 308 N.C. at 164
 
 ,
 
 301 S.E.2d at
 
 95 ;
 
 see also
 

 State v. Johnson,
 

 161 N.C.App. 68
 
 , 73,
 
 587 S.E.2d 445
 
 , 448 (2003).
 

 Following our Supreme Court's decisions, the North Carolina General Assembly recognized the need to protect Due Process rights during identification procedures and passed the North Carolina Eyewitness Identification Reform Act of 2007 ("EIRA"). N.C. Gen.Stat. § 15A-284.52. The EIRA was enacted "to help solve crime, convict the guilty, and exonerate the innocent in criminal proceedings by improving procedures for eyewitness identification of suspects." N.C. Gen.Stat. § 15A-284.51. Originally the EIRA only applied to photographic lineups, defining a photographic lineup as a "procedure in which an array of photographs is displayed to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime." N.C. Gen.Stat. § 15A-284.52(a)(7). The General Assembly recently expanded the EIRA's scope, now applying it to in-person show-ups in addition to photographic lineups. Act of August 11, 2015, ch. 15A, sec. 284.52,
 
 2015 N.C. Sess. Laws 2015
 
 -212.
 

 A. North Carolina Eyewitness Identification Reform Act of 2007
 

 The EIRA directs all "State, county, and other local law enforcement" to follow specific requirements in conducting a photographic
 
 *421
 
 lineup. N.C. Gen.Stat. § 15A-284.52(b). The EIRA requirements vary in detail based on whether the lineup administrator is independent or non-independent.
 
 *164
 
 The EIRA provides greater detail for independent administrators under section 15A-284.52(b). An independent administrator must give specific instructions to the eyewitness before the lineup: the perpetrator might or might not be present in the lineup; the administrator does not know the suspect's identity; the eyewitness should not feel compelled to make an identification; it is as important to exclude innocent persons as it is to identify the perpetrator; and the investigation will continue whether or not an identification is made. N.C. Gen.Stat. § 15A-284.52(b)(3). The suspect's photo must "resemble the suspect's appearance at the time of the offense." N.C. Gen.Stat. § 15A-284.52(b)(4). The independent administrator must also use photos of other persons, called "filler photos." N.C. Gen.Stat. § 15A-284.52(a)(2). These fillers must "generally resemble the eyewitness's description of the perpetrator, while ensuring that the suspect does not unduly stand out from the fillers." N.C. Gen.Stat. § 15A-284.52(b)(5). The photographic lineup must include a minimum of five filler photos in addition to the photo of the suspect.
 

 Id.
 

 No "information concerning any previous arrest, indictment, or conviction of the suspect shall be visible or made known to the eyewitness." N.C. Gen.Stat. § 15A-284.52(b)(7). Lastly, the independent administrator "shall seek and document a clear statement ... as to the eyewitness's confidence level that the person identified in a given lineup is the perpetrator." N.C. Gen.Stat. § 15A-284.52(b)(12). If the eyewitness successfully identifies the perpetrator, the administrator "shall not [provide] any information concerning the [perpetrator] before the lineup administrator obtains the eyewitness's confidence statement about the selection." N.C. Gen.Stat. § 15A-284.52(b)(13).
 

 Conversely, section 15A-284.52(c) of the EIRA provides greater breadth for non-independent administrators:
 

 Alternative Methods for Identification if Independent Administrator Is Not Used.-In lieu of using an independent administrator, a photo lineup eyewitness identification procedure may be conducted using an alternative method specified and approved by the North Carolina Criminal Justice Education and Training Standards Commission. Any alternative method shall be carefully structured to achieve neutral administration and to prevent the administrator from knowing which photograph is being presented to the eyewitness during the identification
 
 *422
 
 procedure. Alternative methods may include any of the following:
 

 (1) Automated computer programs that can automatically administer the photo lineup directly to an eyewitness and prevent the administrator from seeing which photo the witness is viewing until after the procedure is completed.
 

 (2) A procedure in which photographs are placed in folders, randomly numbered, and shuffled and then presented to an eyewitness such that the administrator cannot see or track which photograph is being presented to the witness until after the procedure is completed.
 

 (3) Any other procedures that achieve neutral administration.
 

 N.C. Gen.Stat. § 15A-284.52(c).
 

 Lastly, the EIRA provides remedies for noncompliance in section 15A284.52(d). Courts must consider noncompliance while hearing motions to suppress or claims of eyewitness misidentification. N.C. Gen.Stat. § 15A-284.52(d)(1)-(2). The EIRA maintains similar scrutiny in jury trials, stating "[w]hen evidence of compliance or noncompliance with the requirements ... has been presented at trial, the jury shall be instructed that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identification." N.C. Gen.Stat. § 15A-284.52(d)(3).
 

 In this case, Detective Russell is a non-independent administrator subject to the broader requirements for alternative lineups under section 15A-284.52(c). Detective Russell testified in detail about his use of the approved folder method, randomizing manila folders so that he could not track any photo. N.C. Gen.Stat. § 15A-284.52(c)(2). He achieved neutral administration by using the statutory method.
 

 Id.
 

 Detective Russell met the additional requirements of the EIRA, instructing Mr. Stimpson with a signed instruction form mirroring the EIRA, using
 
 *165
 
 one photo of Defendant and five filler photos of similar looking men, and documenting Mr. Stimpson's confidence in the identification without providing information on any one suspect. N.C. Gen.Stat. § 15A-284.52(b). We have examined all of the seven filler photos used in this case and we agree with the trial court that they are similar to Defendant's photo. We hold Detective Russell's administration of the photographic lineup met the statutory requirements; thus there was no error in admitting this testimony, much less any plain error.
 
 *423
 

 B. Defendant's Argument
 

 Defendant contends the trial court plainly erred in allowing Detective Russell's testimony because Detective Russell could not identify the specific five filler photos he used, out of the seven filler photos he selected for the lineup. Defendant elaborates on this point as follows:
 

 Here, Detective Russell brought eight photographs [seven fillers and one photo of Defendant] but only used six of them. It is impossible to know which six photographs he used. Detective Russell testified that he didn't remember which of the [filler] photographs he used. As stated above, it is impossible for the photographs used to be admitted into evidence when the detective himself is unsure which ones were used. The eight photographs were admitted into evidence but no one, including Detective Russell, can know which of those were used in the photographic lineup.
 

 We are not persuaded. Although the reliability of Detective Russell's testimony is initially a consideration for the trial judge, the weight to be given his testimony is a question for the jury. We do not hold Detective Russell's failure to recall which five filler photos were used to be of such significance as to render his testimony inadmissible. Rather, his failure to recall goes to the weight to be accorded to his testimony.
 

 The witness's credibility is a matter for the court "when the only testimony justifying submission of the case to the jury is inherently incredible and in conflict with the ... State's own evidence."
 
 State v. Wilson,
 

 293 N.C. 47
 
 , 51,
 
 235 S.E.2d 219
 
 , 221 (1977) (citations omitted). No such conflict exists here. Any issue concerning Detective Russell's credibility, or the weight to be given to his testimony, was a matter for the jury. The trial court therefore did not err, much less commit plain error, in admitting this testimony.
 

 Next, Defendant argues the reliability of Mr. Stimpson's in-court identification of Defendant was tainted by the procedures used by Detective Russell. "The credibility of a witness's identification testimony is a matter for the jury's determination, and only in rare instances will credibility be a matter for the court's determination."
 
 State v. Green,
 

 296 N.C. 183
 
 , 188,
 
 250 S.E.2d 197
 
 , 200-201 (1978) (citations omitted). Finding no EIRA violations in the photographic lineup, "there is no danger [the lineup identification] impermissibly tainted the in-court identification[s]."
 
 State v. Lawson,
 

 159 N.C.App. 534
 
 , 539,
 
 583 S.E.2d 354
 
 , 358 (2003) (citations omitted). During his direct testimony, Mr. Stimpson identified Defendant as his assailant three times. Given
 
 *424
 
 Mr. Stimpson's repeated identifications, and the failure of defense counsel to elicit any evidence of improper suggestions made during the lineup, we can discern no plain error in this proceeding.
 

 Lastly, we have reviewed all eight photos from the photographic lineup, marked State's exhibit numbers 1-A, 1-B, 1-C, 1-D, 1-E, 1-F, 1-G, and 1-H. None of the photos contain "information concerning any previous arrest, indictment, or conviction ..." nor do they conspicuously depict a jail setting or jail clothing. N.C. Gen.Stat. § 15A-284.52(b)(7). All seven filler photos, State's exhibit numbers 1-B, 1-C, 1-D, 1-E, 1-F, 1-G, 1-H, "generally resemble" Mr. Stimpson's description of the perpetrator, and ensure that Defendant's photo, State's exhibit 1-A, "does not unduly stand out from the fillers." N.C. Gen.Stat. § 15A-284.52(b)(5). The photos did not taint any in-court identification at trial, and the trial court did not err in admitting the photos.
 

 *166
 

 C. Ineffective Assistance of Counsel
 

 Defendant contends that he received ineffective assistance of counsel from his trial counsel. We dismiss this argument without prejudice to the right of Defendant to file a motion for appropriate relief in the trial court.
 

 "In general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal."
 
 State v. Stroud,
 

 147 N.C.App. 549
 
 , 553,
 
 557 S.E.2d 544
 
 , 547 (2001) (citations omitted). "Our Supreme Court has instructed that should the reviewing court determine the [ineffective assistance of counsel] claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's rights to reassert them during a subsequent MAR proceeding."
 

 Id.
 

 at 554
 
 ,
 
 557 S.E.2d at 547
 
 (quotation marks and citation omitted).
 

 The record does not disclose whether the actions of trial counsel, which Defendant contends deprived him of an effective defense, were part of a broader trial strategy. We cannot resolve this question without a fuller record on appeal in which all evidence can be presented. We therefore dismiss this claim without prejudice to the right of Defendant to file a motion for appropriate relief at a later date.
 

 IV. Conclusion
 

 For the foregoing reasons, we find
 

 NO ERROR.
 

 Chief Judge McGEE and Judge DAVIS concur.