GEER, Judge.
Defendant Bobby Ray Grady appeals his conviction of first degree rape, first degree sexual offense, and second degree kidnapping. Defendant argues on appeal that he is a "gray area" defendant as described in Indiana v. Edwards, 554 U.S. 164, 171 L.Ed.2d 345, 128 S.Ct. 2379 (2008) -competent to stand trial, but not to represent himself and, therefore, the trial court erred by allowing defendant to represent himself without determining that he was competent to do so. We disagree, and find that the trial court did not err in allowing defendant to represent himself.
Facts
On 13 March 2011, Jane Smith[1] worked a shift from 7:00 p.m. to 2:00 a.m. as a supervisor at an internet sweepstakes business in Kinston, North Carolina. At about 2:00 a.m. on 14 March 2011, Mrs. Smith locked up at work and left to head home. As she was driving home on Highway 70, she approached Bill Lane Boulevard, but could not move into the right turn lane for Bill Lane Boulevard because it was blocked by a red BMW, with defendant sitting in the driver's seat of that vehicle with the door open. Mrs. Smith cracked her window and asked defendant if everything was okay, and he said he could not get anybody on his cell phone and was stuck. Defendant asked Mrs. Smith if she could help him move his car to the side of the road, and she did. Although it was dark, Mrs. Smith could see defendant's face because of the lights from the cars. Afterwards, defendant asked if Mrs. Smith could give him a ride to his home off Emmaus Church Road, and since Mrs. Smith lived off that road, she agreed.
When they turned onto Emmaus Church Road, defendant said that he lived in the second trailer on the right. As Mrs. Smith started to slow down and approach the trailer, defendant leaned over and held a sharp object against Mrs. Smith's throat. Mrs. Smith could feel it cutting her skin. Defendant told her to make the next right onto Casey Mill Road and pull off at the speed limit sign. Defendant, still holding a knife to Mrs. Smith's throat, asked her to turn off the car and its lights. He then opened the passenger door to Mrs. Smith's minivan and told Mrs. Smith to get out through that door.
After exiting the car, defendant, while still holding the knife to Mrs. Smith's throat, made her sit on the ground. Defendant unzipped his pants and forced Mrs. Smith to perform oral sex on him. Defendant then made Mrs. Smith lay down on the ground, remove her pants and underwear, and performed oral sex on her, with the knife at her leg. After that, defendant engaged in vaginal intercourse with the knife held at Mrs. Smith's throat. Defendant pulled out and ejaculated on the ground and then unsuccessfully tried to burn that part of the ground with his lighter. A car drove by, and defendant lay on top of Mrs. Smith so she could not move.
Defendant told Mrs. Smith to get dressed and get back in the car. He then said, "I'm not going to kill you, but I was supposed to, it's part of a Blood initiation." Defendant made Mrs. Smith drive him back to his red BMW, and on the way he said, "Don't forget, don't tell or I will kill you." After dropping defendant back off at his car, Mrs. Smith "turned around and floored it out and left."
Mrs. Smith drove past her neighborhood first because she was worried defendant might be following her, but eventually she went home and woke up her husband and told him what had happened. She did not want to call the police because she was worried defendant was going to find her and kill her, but her husband called 911 anyway. When Deputy Michael Biggins of the Wayne County Sheriff's Office arrived, about 15 minutes later, Mrs. Smith told him that her attacker was "a tall, black male, about six foot, between 150 and 200 pounds, and he had an extreme lazy eye and looked like he had a broken nose." Mrs. Smith then went to the hospital, where a rape kit was completed and the examination noted two horizontal scratches on Mrs. Smith's neck.
Deputy Biggins thought Mrs. Smith had described someone he had encountered several times, but he could not recall the man's name. He did remember an address associated with the man since he had been to the address several times. Deputy Biggins called the dispatch office and had them look up the address and read off names associated with it-that search led to defendant's name.
Deputy Biggins contacted Deputy Kenneth Lupton of the Wayne County Sheriff's Office, his sergeant at the time, and asked him to go to the Bill Lane Boulevard area identified by Mrs. Smith and see if he could locate the red BMW. Law enforcement officers found a red BMW at the location Mrs. Smith described and had a wrecker take it to a secure location. The vehicle was registered to Linda Grady Johnson at the address Deputy Biggins had recalled.
The following day, 14 March 2011, Mrs. Smith received a call asking her to go to the sheriff's annex. While at the annex, Mrs. Smith identified defendant in a double-blind photographic lineup, presented to her by Detective Tammy Odom Mozingo of the Wayne County Sheriff's Office. Detective Mozingo acted as the lineup administrator and knew nothing about the case or which person in the lineup was the suspect. Mrs. Smith wrote on defendant's picture in the lineup: "Not one hundred percent, but pretty close." Detective Mozingo asked Mrs. Smith to be more accurate with the percentage amount, so Mrs. Smith added "I'm ninety percent sure."
After Mrs. Smith identified defendant in the photographic lineup on 14 March 2011, defendant was arrested. At defendant's probable cause hearing on 16 May 2011, where defendant was represented by counsel, defendant told the court that Mrs. Smith was willing during all the sexual acts, that defendant did not have to force anything, and that Mrs. Smith was the one pushing it.
DNA test results of the external and internal vaginal swabs taken during Mrs. Smith's rape kit exam were inconclusive. The results excluded Mrs. Smith's husband, but the samples were of "insufficient quality or quantity" to exclude defendant. The sample taken from her underwear could not exclude either Mrs. Smith's husband or defendant.
On 16 March 2011, defendant indicated he wanted to waive counsel, but on the waiver of counsel form, in place of his signature on the form, he wrote, "I refuse to sign." Defendant was still represented during the preliminary hearing by Kenneth Rouse. Mr. Rouse filed a motion to withdraw as defendant's counsel on 25 May 2011, attached a handwritten motion from defendant, and stated it was clear from the motion that defendant was "plainly expressing he does not want court appointed counsel." Upon Mr. Rouse's withdrawal, William Bland was appointed to represent defendant. On 16 June 2011, Mr. Bland moved to withdraw from representation of defendant, citing a conflict of interest for his firm, and Jim Copeland was appointed as defendant's counsel.
When Mr. Copeland met with defendant, it was clear that defendant did not want Mr. Copeland or anyone else representing him, so Mr. Copeland moved to withdraw, and his motion was granted at a hearing on 20 July 2011. At the hearing on 20 July 2011, Judge Arnold O. Jones II asked defendant if he understood his right to counsel, to which defendant responded, "Yes." Judge Jones then asked defendant if he wanted a lawyer appointed for him, if he wanted to represent himself, or if he wished to hire his own lawyer, to which defendant replied: "Represent myself, sir." On the waiver of right to counsel form, however, defendant once again wrote in place of his signature, "Refuse to sign." Judge Jones then expressed concern that defendant "may not fully understand the gravity of what's going on" and decided to send defendant to Central Regional Hospital for a psychological evaluation.
In his order committing defendant to Central Regional Hospital Raleigh Campus to be examined on his capacity to proceed, Judge Jones wrote that "[t]he court needs to have the Defendant's capacity to (1) understand/comprehend rights to counsel and the effect of not having counsel[;] (2) understand the proceedings against him[;] (3) represent himself at pretrial/trial." The psychological evaluation was conducted on 25 August 2011 by Senior Psychologist Nancy E. Laney. In her 8 November 2011 report, Dr. Laney concluded that defendant was capable of proceeding to trial and that defendant "appreciates his decision to represent himself versus allowing a public defender to represent him."
In explaining her conclusions, Dr. Laney stated that defendant had "no history of intellectual impairment or cognitive difficulties." Dr. Laney did state that defendant had a history of substance abuse and sought mental health treatment for various self-reported mood symptoms, and at times he reported psychotic symptoms such as hallucinations and paranoia, but he was never observed to be actively psychotic. Dr. Laney noted, in relation to defendant's self-reported symptoms, that they "led to diagnosis of mental illness and a legal determination of Not Guilty by Reason of Insanity in the State of Florida [,]" but she went on to state that "these diagnoses were questioned numerous times by multiple providers."
On 8 February 2012, Charles Gurley was appointed to represent defendant. Mr. Gurley, however, moved to withdraw on 13 March 2012, on the grounds of lack of communication and that defendant was trying to advise him on what motions to file and what law to file.
In a hearing on 4 September 2012 before Judge Jones, defendant renewed his request to proceed pro se. Judge Jones asked defendant whether he still understood the charges against him and wished to proceed pro se and found that he did. Judge Jones then engaged in the following colloquy with defendant:
THE COURT: All right. I've got a few more questions.
Do you understand that you have a constitutional right to be represented by a lawyer?
THE DEFENDANT: Yes, sir.
THE COURT: Do you understand if you want a lawyer and you can't afford a lawyer, I have and I will continue to appoint you a lawyer to represent you in this case?
THE DEFENDANT: Yes, sir.
THE COURT: Do you understand if you decide-and you can change your mind at any time. We're not done with this yet. But if you decide to represent yourself, I will not give you legal advice concerning any legal defenses, jury instructions, or any other legal issue that may be raised at a trial. Do you understand that?
THE DEFENDANT: I understand, sir, that you can't do that because you're impartial.
Judge Jones then asked defendant again if he understood what he was charged with, to which defendant first stated, "No, sir[,]" but then acknowledged that the judge had previously told him the charges and their maximum penalties. After reciting the charges another time, the trial judge asked again if defendant understood the charges, and defendant replied, "I know-I know I'm charged with it." Finally, the trial judge asked defendant whether he still wished to represent himself, and after some initial confusion as to whether he would be heard on a motion to dismiss, defendant replied: "I would like to represent myself, Your Honor."
After that colloquy, Judge Jones made the following findings:
THE COURT: I must-I find that a request to proceed pro se must be clear and unequivocal in order for me to act on that. And he has made a clear and unequivocal request. I have made what I think is more than a proper inquiry this morning. I think I've asked the questions that the Supreme Court of North Carolina has required me to ask. And I've gone beyond that.
I'm finding that he has waived his rights to assignment of counsel and to all counsel.
....
I find that the only basis for denying a waiver is that his decision to waive is not knowing, voluntary, and intelligent. A decision to deny waiver cannot be based on his ability to present an effective defense because, for example, he has limited education or intellectual functioning. And I find he meets that standard, in that I find that I do not have the basis to deny him his constitutional right to represent himself, based on everything I've read and heard today.
Prior to today, there was a request made to-or a decision made to have him evaluated, and I have received a copy of that evaluation and have made reference to that evaluation, and have considered that as part of my ruling today.
So I'm going to allow the motion to withdraw on behalf of Mr. Gurley. And I'm going to find, based on-I'm making-just incorporate everything that I've heard today and findings I've just made that the defendant, Mr. Grady, is exercising his constitutional right to represent himself. And based on everything I've heard, I'm going to allow that motion.
In addition, Judge Jones, after granting Mr. Gurley's motion to withdraw, appointed Mr. Gurley as defendant's standby counsel.
During the pre-trial phase, defendant filed numerous motions, as well as various civil actions in state and federal court against two judges, the district attorney and assistant district attorney, and defendant's lawyers. On 22 July 2013, defendant's case was set for trial, but before it could proceed, presiding Judge William Pittman stated that he had "serious concerns" about whether defendant could "represent himself or assist in the representation of himself in a rational or reasonable manner."
Judge Pittman ordered a competency hearing for 9 September 2013 and requested that Dr. Laney be subpoenaed to testify at that hearing. At the hearing on 9 September 2013, Judge Jones was presiding and heard testimony from Dr. Laney. Judge Jones ordered that defendant be re-evaluated by Dr. Laney for two reasons: (1) to review Dr. Laney's previous findings regarding defendant's capacity to proceed to trial; and (2) to evaluate defendant's capacity at the time of the alleged offenses.
Dr. Laney re-evaluated defendant on 18 October 2013, and her opinions were set out in two separate reports dated 11 December 2013. The first report dealt with whether defendant had the ability to form the mental intent to commit the alleged offenses on 14 March 2011 and found that there was "no sufficient basis to indicate that [defendant] suffered from a mental disease or defect" at the time of the alleged offenses. Dr. Laney prepared a separate report re-evaluating defendant's current capacity to understand the nature and object of the proceedings against him, to comprehend his own situation relating to the proceedings, and to assist in his own defense in a rational or reasonable manner. At the conclusion of that 11 December 2013 report, Dr. Laney stated that her opinions "have not changed" and that she had still concluded that defendant was capable of proceeding to trial.
On 3 February 2014, Judge Jones conducted a competency hearing, with defendant representing himself pro se and Mr. Gurley present as standby counsel. At the hearing, defendant sought to preserve the confidentiality of the records of his mental health evaluations, and the trial court assured him that the reports would be sealed. Defendant further sought to have the courtroom cleared except for essential witnesses, and included in his request that the victim not be allowed to remain in the room, which Judge Jones declined to rule on until such point as particular questions of witnesses raised issues to which defendant wished to object. Defendant never made any such objections.
Dr. Laney then proceeded to testify and summarized her findings that defendant was competent to proceed to trial and assist in his defense, that defendant understood and appreciated his decision to represent himself versus having a public defender represent him, and that on the night of the offenses in issue, defendant was capable of forming the specific intent to commit the alleged offenses. Judge Jones adopted Dr. Laney's findings as findings of the court, and concluded that defendant "is capable of proceeding to trial, comprehending his own situation, and has the ability and capability to understand the nature and ... object of the proceedings against him." Judge Jones also found that defendant "had the capacity at the time of the alleged offenses to form the mental intent to commit the alleged offenses."
Before the conclusion of the 3 February 2014 hearing, the State referred to "new case law," Edwards, and suggested that it "probably requires the Court to ask some additional questions about the issue of effective waiver of counsel, so we may need to have another hearing another time to address that issue." Defendant also asked Judge Jones to rule on his "Judicial Notice of Adjudicated Facts," which included numerous handwritten pro se motions. Judge Jones declined to consider these motions and stated that they should be heard by the trial judge.
Defendant's case was brought to trial on 21 April 2014 before Judge Ebern T. Watson, III. Defendant actively participated in the trial proceedings. He moved for and was granted full recordation of the trial proceedings. Prior to jury selection, defendant raised his remaining pre-trial motions, including the "Judicial Notice of Adjudicated Facts," and Judge Watson informed him that he would save time to address those after jury selection but before the jury was empaneled. Defendant moved for a special venire via questionnaire sent to the potential jurors, which was denied. Defendant moved to sequester the witnesses, and with a few exceptions, such as for the victim, the trial court granted the motion, effective once the jury was empaneled. Defendant also actively participated in jury selection.
Defendant represented himself during opening statements and the beginning of the State's direct examination of its first witness, Mrs. Smith; but eventually, during that direct examination, defendant asked for his standby counsel, Mr. Gurley, to take over the case. Judge Watson explained to defendant that if he wanted Mr. Gurley to take over, he would be his attorney and first counsel from that point forward. Further, Judge Watson stated:
THE COURT: No. Listen, if you-if you're choosing to now tell me in open court that you believe you have reached a point in this litigation where you no longer are satisfied representing yourself because things have come up for determination that you believe may be beyond your experience level or exposure level, and Mr. Gurley is in a better position, knowing what the tactics are that are involved in litigation, if you believe that it's in your best interest to have him appointed in your case to represent you, I will do that. But, you must understand, once that change takes place, he will take the helm, and he will remain as the only litigator in your case. You and he can converse about anything at any time you choose to. And by him doing this, it doesn't forfeit at all anything that's already been offered by you in at any preliminary hearings or any matters that the Court has been asked to take notice of at this point.
And defendant responded, "Yes, sir."
During trial, Mrs. Smith identified defendant as the person she saw in the red BMW, and when asked if defendant was the person who kidnapped her, forced her to perform oral sex, performed oral sex on her, and raped her, she stated she was "[one] hundred percent" certain that he was. At the conclusion of the trial, the jury found defendant guilty of all three counts of first degree rape, first degree sexual offense, and first degree kidnapping.
Judge Watson consolidated the first degree rape and first degree sex offense convictions in a single judgment and imposed a presumptive-range sentence of 317 to 390 months imprisonment. The trial court arrested judgment on the first degree kidnapping charge and sentenced defendant for second degree kidnapping to a consecutive presumptive-range term of 33 to 49 months imprisonment. Defendant timely appealed to this Court.
I
Defendant first argues on appeal that the trial court erred by allowing him to represent himself during part of the trial "without determining that he was competent to do so." Defendant does not challenge the court's determination that he was competent to proceed to trial, but argues that his ability to represent himself was never determined and asks that his conviction be set aside, or, in the alternative, that the case be remanded to the superior court to determine if defendant was competent to act as his own attorney.
In this case, the trial court conducted a hearing on 4 September 2012 on defendant's renewed request to proceed pro se and concluded that he "waived his rights to assignment of counsel and to all counsel." The trial court further concluded that it had no basis to deny defendant his constitutional right to represent himself. Defendant argues, however, that the trial judge erroneously never decided whether he was competent to represent himself, relying primarily on Edwards.
In Edwards, the United States Supreme Court considered the situation of "a criminal defendant [who] has sufficient mental competence to stand trial" but "lacks the mental capacity to conduct his trial defense unless represented." 554 U.S. at 174, 171 L.Ed.2d at 355, 128 S.Ct. at 2385-86. The Supreme Court concluded that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky [v. United States, 362 U.S. 402, 4 L. Ed 2d 824, 80 S.Ct. 788 (1960) (per curiam ) ] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Id. at 178, 171 L.Ed.2d at 357, 128 S.Ct. at 2388. Ultimately, the Supreme Court held in Edwards that a state's refusal to allow a "gray-area" defendant to conduct his own defense at trial does not violate the Constitution. Id. at 177-78, 171 L.Ed.2d at 357, 128 S.Ct. at 2387-88.
Our Supreme Court addressed Edwards in State v. Lane, 362 N.C. 667, 669 S.E.2d 321 (2008) (per curiam) (" Lane I "), clarified, 363 N.C. 121, 706 S.E.2d 775 (2009), as well as State v. Lane, 365 N.C. 7, 707 S.E.2d 210 (2011) ("Lane II "), the Supreme Court's decision after remand of Lane I. Those opinions explain the proper application of Edwards in a case like this one.
In Lane I, the underlying action was remanded to the lower court to determine whether, at the time the defendant sought to represent himself, he came within the Edwards category of "borderline-competent" defendants who are " 'competent enough to stand trial under Dusky ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.' " 362 N.C. at 668, 669 S.E.2d at 322 (quoting Edwards, 554 U.S. at 178, 171 L.Ed.2d at 357, 128 S.Ct. at 2388 ). After remand, in Lane II, the matter came back to our Supreme Court, which concluded that where a defendant,
after being found competent, seeks to represent himself, the trial court has two choices: (1) it may grant the motion to proceed pro se, allowing the defendant to exercise his constitutional right to self-representation, if and only if the trial court is satisfied that he has knowingly and voluntarily waived his corresponding right to assistance of counsel ...; or (2) it may deny the motion, thereby denying the defendant's constitutional right to self-representation because the defendant falls into the "gray area" and is therefore subject to the "competency limitation" described in Edwards. [Only then will the trial court] make findings of fact to support its determination that the defendant is unable to carry out the basic tasks needed to present his own defense without the help of counsel [pursuant to Edwards ].
365 N.C. at 22, 707 S.E.2d at 219 (internal citations and quotation marks omitted).
The Supreme Court held in Lane II that since the defendant in that case was allowed to represent himself, he "was never denied his constitutional right to self-representation[.]" Id., 707 S .E.2d at 220. Consequently, our Supreme Court concluded in Lane II that "the Supreme Court's holding in Edwards, that the State may deny that right if a defendant falls into the 'gray area' of competence," did not control. Id.
Instead, the Court held that after the trial court found the defendant competent to stand trial under the Dusky standard, and before it allowed the defendant's motion to represent himself, "the trial court properly conducted a thorough inquiry and determined that defendant's waiver of his constitutional right to counsel was knowing and voluntary." Lane II, 365 N.C. at 23, 707 S.E.2d at 220. See also State v. Newson, --- N.C.App. ----, ----, 767 S.E.2d 913, 920 (2015) ("[B]ecause the trial court granted Defendant's motion to proceed pro se, Edwards is inapplicable, and we need only examine whether 'the trial court properly conducted a thorough inquiry and determined that [D]efendant's waiver of his constitutional right to counsel was knowing and voluntary.' " (quoting Lane II, 365 N.C. at 23, 707 S.E.2d at 220 )). In Newson, this Court concluded that the trial court did not err in its determination that the defendant "knowingly and voluntarily waived his right to counsel, nor did the trial court err by not making any further inquiry under Edwards. " Id. at ----, 767 S.E.2d at 920.
Lane II and the cases that follow it control our analysis in this case. Here, the trial court granted defendant's motion to proceed pro se and found defendant could represent himself. The trial court stated that it had no basis for denying defendant's motion and concluded that defendant was "exercising his constitutional right to represent himself." Therefore, since the trial court in this case granted defendant's motion to proceed pro se, and he was not denied his right to conduct his own defense, Edwards is not applicable, and the only relevant inquiry is whether defendant knowingly and voluntarily waived his right to counsel. Accordingly, since the trial court decided defendant could represent himself, it then had to inquire into whether defendant's waiver of his right to counsel was knowing and voluntary. Lane II, 365 N.C. at 23, 707 S.E.2d at 219-20.
In addition, in State v. Cureton, 223 N.C.App. 274, 290, 734 S.E.2d 572, 584 (2012), this Court explained that even if the defendant-who had both forfeited his right to counsel through misconduct and failed to assert it-could successfully demonstrate that his diminished mental capacity made him a "gray-area" defendant, Edwards and other cases "make it clear that the constitution does not prohibit the self-representation of a 'gray-area' defendant." Id. The Court concluded that "[a]lthough self-representation resulting from forfeiture is not the same concept as self-representation due to voluntary waiver, the Supreme Court has expressly refused to adopt a higher competency standard for self-representation in general." Id.
Defendant's argument on appeal that Edwards requires an additional determination that a defendant competent to stand trial is also competent to represent himself cannot be reconciled with Lane II and subsequent authority from this Court, which defendant does not address. Lane II expressly holds otherwise, concluding that an inquiry under Edwards into a defendant's competency to represent himself is only required if the trial court denies the defendant's right to represent himself. Lane II, 365 N.C. at 23, 707 S.E.2d at 219. Thus, under Lane II, the prosecutor's suggestion in this case that a separate hearing under Edwards might be required was erroneous.
Defendant also argues that he was not competent to represent himself because his self-representation was inadequate, citing to numerous actions defendant took throughout pre-trial and the beginning of the trial. Lane II unambiguously holds, however, that the standard for self-representation is the same as the standard for proceeding to trial. Id. at 20-21, 707 S.E.2d at 218-19 ("Accordingly, 'the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself,' meaning that 'a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation .' " (quoting Godinez v. Moran, 509 U.S. 389, 399-400, 125 L.Ed.2d 321, 332-33, 113 S.Ct. 2680, 2687 (1993) )). Thus, the fact that defendant may have inadequately represented himself at trial is immaterial. We note that defendant does not argue or point to anything that suggests that the trial court should have questioned his competency to proceed to trial given his conduct at trial.
Therefore, the sole issue before this Court is whether the trial court properly determined that defendant's waiver of all counsel was knowing and voluntary. Our Supreme Court found the defendant's waiver in Lane II adequate when he "was able to respond to the trial court's inquiries in a manner that indicated that he (1) understood the charges and proceedings against him and the range of possible punishments, (2) had been clearly advised of his right to counsel, and (3) appreciated the consequences of his decision to waive that right." Id. at 26, 707 S.E.2d at 222.
In State v. Jastrow, --- N.C.App. ----, ----, 764 S.E.2d 663, 668 (2014) (quoting State v. Thomas, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992) ), this Court explained that " '[b]efore allowing a defendant to waive in-court representation by counsel ... the trial court must insure that constitutional and statutory standards are satisfied.' " In order to satisfy those standards, " '[a] defendant must first clearly and unequivocally waive his right to counsel, and elect to proceed pro se. Thereafter, the trial court must determine whether the defendant knowingly, intelligently, and voluntarily waived his right to in-court representation by counsel.' " Id. at ----, 764 S.E.2d at 668 (quoting State v. Anderson, 215 N.C.App. 169, 170, 721 S.E.2d 233, 234 (2011), aff'd per curiam, 365 N.C. 466, 722 S.E.2d 509 (2012) ).
Under N.C. Gen.Stat. § 15A-1242 (2015), a defendant may represent himself at trial only after the trial judge makes a thorough inquiry and is satisfied that the defendant:
(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;
(2)Understands and appreciates the consequences of this decision; and
(3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.
"Our Supreme Court has determined that N.C. Gen.Stat. § 15A-1242 fully satisfies the constitutional requirement that waiver of counsel must be knowing and voluntary." State v. Paterson, 208 N.C.App. 654, 660, 703 S.E.2d 755, 759 (2010) (internal quotation marks omitted).
Additionally, N.C. Gen.Stat. § 7A-457(a) (2015) states that a waiver of counsel is only effective if the court finds that "at the time of waiver the indigent person acted with full awareness of his rights and of the consequences of the waiver." The statute contains factors the court should consider, including "the person's age, education, familiarity with the English language, mental condition, and the complexity of the crime charged." Id.
Here, defendant makes no argument on appeal that the trial court's inquiry was inadequate under N.C. Gen.Stat. § 15A-1242 and N.C. Gen.Stat. § 7A-457(a), and our review of the court's inquiry establishes that the court met the required standards. The trial court, by questioning defendant, first confirmed that defendant understood his right to be assisted by counsel and that he was entitled to appointment of counsel, ensuring that defendant knew that he could change his mind at any time. The court further confirmed that defendant understood and appreciated the consequences of deciding to represent himself, with defendant volunteering that he understood the trial court could not help him because the court was required to remain impartial. Finally, the trial court repeatedly confirmed that defendant comprehended the charges filed against him and the maximum penalties he faced. After the court's questioning, defendant still confirmed that he wished to proceed without the assistance of counsel. The court then found that defendant waived his right to all counsel and that it had no basis to deny his waiver. In making this decision, the record establishes that the court was aware of and took into account the factors in N.C. Gen.Stat. § 7A-457(a).
We hold that the trial court's inquiry complied with the statutory and constitutional requirements. Accordingly, we conclude that the trial court committed no error in allowing defendant to represent himself at trial.
II
Next, defendant contends that (1) the trial court erred in admitting into evidence the photographic lineup, and (2) it was plain error to allow the victim, Mrs. Smith, to identify defendant as her assailant in open court. We disagree with respect to both arguments.
First, as to defendant's argument that the trial court erred in denying his motion to suppress the photographic lineup, this Court's review is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).
This Court explained in State v. Stowes, 220 N.C.App. 330, 338, 727 S.E.2d 351, 356 (2012) (internal citations and quotation marks omitted):
Our Courts apply a two-step process for determining whether an identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification[.] First, the Court must determine whether the identification procedures were impermissibly suggestive. Second, if the procedures were impermissibly suggestive, the Court must then determine whether the procedures created a substantial likelihood of irreparable misidentification.
Defendant argues that the lineup was impermissibly suggestive. Specifically, defendant claims that because he suffered from "strabismus," which gives him the appearance of having crossed-eyes, and no other person in the lineup had crossed-eyes, the lineup was impermissibly suggestive.
This Court has held, however, "[t]hat defendant's appearance was somehow distinct from the other suspects' photographs did not alone render the lineup impermissibly suggestive." State v. Suggs, 86 N.C.App. 588, 594, 359 S.E.2d 24, 28 (1987). Phrased differently, " '[t]he mere fact that defendant ha[s] specific identifying characteristics not shared by the other participants does not invalidate the lineup.' " State v. Roberts, 135 N.C.App. 690, 693, 522 S.E.2d 130, 132 (1999) (quoting State v. Gaines, 283 N.C. 33, 40, 194 S.E.2d 839, 844 (1973) ). As the Supreme Court noted, if the rule were otherwise, "no lineup would be valid because no two men are alike." Gaines, 283 N.C. at 40, 194 S.E.2d at 844 (holding that lineup was not impermissibly suggestive even though defendant had a unique voice and was also the youngest and lightest of those in the lineup). It is sufficient if "the lineup subjects approximated the general physical description given by the victim; and defendant was not rendered conspicuous by police procedures." Id., 194 S.E.2d at 844.
Defendant has pointed out that the majority of the cases cited by the State pre-date the enactment of N.C. Gen.Stat. § 15A-284.52(b)(5) a (2015), which passed in 2007 as part of the Eyewitness Identification Reform Act ("EIRA"). N.C. Gen.Stat. § 15A-284.52(b)(5) a (emphasis added) states that "[a]ll fillers selected shall resemble, as much as practicable, the eyewitness's description of the perpetrator in significant features, including any unique or unusual features." The statute's language-"as much as practicable"-indicates that the legislature anticipated that it may not always be feasible to find fillers to put in the lineup with a defendant's specific, unique feature.
Even if the lineup were suggestive, defendant would have to show that it was impermissibly suggestive, which will only be the case " 'if all the circumstances indicate that the procedure resulted in a very substantial likelihood of irreparable misidentification.' " Suggs, 86 N.C.App. at 594, 359 S.E.2d at 28 (quoting State v. Lyszaz, 314 N.C. 256, 264, 333 S.E.2d 288, 294 (1985) ). Defendant has not, however, met that burden.
This Court explained in State v. Gamble, --- N.C.App. ----, ----, 777 S.E.2d 158, 163 (2015) (internal quotation marks omitted), that "[t]he North Carolina Supreme Court has developed a totality of the circumstances test to determine if a pretrial procedure was impermissibly suggestive, defining impermissible suggestiveness as so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." Gamble identifies several factors to be considered by courts when determining whether a procedure was unnecessarily suggestive, including: "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." Id. at ----, 777 S.E.2d at 163.
In this case, as the State points out, "[t]he double-blind procedure followed here, in full compliance with [N.C. Gen.Stat.] § 15A-284.52, was first, for an officer not familiar with the investigation to assemble photographs of five others similar to defendant in sex, race, age, height and weight.... And second, the array was presented to Mrs. [Smith] by another officer who had no information about which of the photographs showed a suspect." The trial court reviewed the photographs used in the lineup and found
no impermissible characteristics that would show this Court that any of those six photographs in any way presuppose a congenital defect that maybe was affecting one of the members of the photographic lineup compared to the others, nor one that may have pointed out in any way the condition of defective eye or a defective nose....
We agree that under the totality of the circumstances, the lineup here was not impermissibly suggestive.
Since we find that the lineup was not impermissibly suggestive, it is unnecessary to analyze whether there was a substantial likelihood of irreparable misidentification. See State v. Wilson, 225 N.C.App. 498, 501, 737 S.E.2d 186, 188-89 (2013) ("Because we have determined that the procedure was not impermissibly suggestive, our due process analysis ends here. Therefore, we need not determine, under the second step in the due process review, whether the procedure created a substantial likelihood of irreparable misidentification[.]" (internal citations omitted)). But even assuming, arguendo, that the lineup was impermissibly suggestive, the numerous opportunities that Mrs. Smith had to see her assailant during the incident minimize the likelihood of misidentification.
Defendant contends that "[i]t is not apparent ... who first suggested that [Mrs. Smith's] assailant had crossed-eyes" and argues that Mrs. Smith's identification of defendant as having cross-eyes may have been "tainted" by Detective Biggins. The evidence, however, shows that Mrs. Smith described defendant right after the incident as having an "an extreme lazy eye," which Detective Biggins understood as meaning that the assailant was cross-eyed. Defendant did not object to this testimony, and there is no evidence suggesting that anyone tried to plant in Mrs. Smith's mind that her perpetrator was cross-eyed.
In addition, in explaining why she had a 90% level of certainty when viewing the photographic lineup and 100% certainty at trial, Mrs. Smith testified that in defendant's lineup photograph, his nose does not appear to have been broken and "the lazy eye is not very dominate," but on the date of the alleged incident, "he had a-like a predominate broken nose and a very dominate lazy eye." Mrs. Smith further stated that these differences, and the fact that on the night in question, defendant wore a "doo-rag," which prevented her from seeing his hairline, were the reason why she was only 90% certain when identifying defendant during the photographic lineup. Her testimony regarding the photographs as compared to defendant's actual physical appearance provides further evidence supporting the trial court's determination that the lineup was not impermissibly suggestive.
Defendant also raises issue with Mrs. Smith's in-court identification of defendant. Since defendant did not object to the identification at trial, the issue was not preserved for appeal and is therefore only reviewed for plain error.
For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]
State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted).
Defendant has failed to show that the trial court's allowing Mrs. Smith to identify defendant as her assailant in open court was plain error. Mrs. Smith had ample opportunity to see defendant the night of the alleged incident: when she helped him move his car, when she gave him a ride, during the rape and sexual offenses, and when she gave him a ride back to his car. In fact, her description of her assailant immediately after the offense was accurate.
Furthermore, Mrs. Smith's in-court identification of defendant was independent of the photographic lineup and based on her observation of him on the night of the offenses. The scant difference in Mrs. Smith's 90% certainty at the lineup and 100% certainty during the in-court identification was explained by her testimony that the photograph did not accurately reflect defendant's broken nose and his cross-eyed look was not as prominent in the photo as it was in person on the night of the assault.
Accordingly, even if the photographic lineup was impermissibly suggestive, Mrs. Smith's in-court identification was admissible because it was based on independent evidence, so it was not error for the trial court to admit her testimony. See State v. Macon, --- N.C.App. ----, ----, 762 S.E.2d 378, 383 ("[E]ven assuming the procedure was impermissibly suggestive, the officers' in-court identification was admissible because it was based on an independent source."), disc. review denied, 367 N.C. 800, 766 S.E.2d 620 (2014). Further, even if there had been error, the ample other evidence presented at trial against defendant, including his admission at the probable cause hearing, shows that any error did not have a probable effect on the verdict. Accordingly, defendant has failed to show plain error.
NO ERROR.
Judges HUNTER, JR. and DILLON concur.
Report per Rule 30(e).

"Jane Smith" is a pseudonym used to protect the privacy of the victim.